[Crim. No. 4207. In Bank.—March 24, 1939.]

THE PEOPLE, Respondent, v. PASQUALE D'ANGELO, Appellant.

Carl H. Allen and J. Bruce Fratis for Appellant.

U. S. Webb, Attorney-General, William F. Cleary, Deputy Attorney-General, Matthew Brady, District Attorney, and Harmon D. Skillin, Assistant District Attorney, for Respondent.

THE COURT.—The evidence is undisputed in effect that on June 14, 1938, defendant killed his wife by decapitating her with a meat cleaver. From a judgment of conviction of the commission by him of the crime of murder in the first degree, which carried with it the imposition of the death sentence, defendant has appealed to this court. Defendant has also appealed from the order by which his motion for a new trial was denied.

On the trial of the action, defendant presented two defenses (1) that he was "not guilty"; and (2) that he was "not guilty by reason of insanity".

On the appeal from the judgment, the point is urged that, on cross-examination of defendant as a witness in his own behalf, prejudicial error was committed by the trial court in that the deputy district attorney in charge of the prosecu-

tion was permitted to ask defendant whether, on an occasion which preceded the killing of his wife, he had not had his wife arrested and taken to a detention hospital, and "tried to have her put in the insane asylum". In view of the fact that on his direct examination, defendant had testified extensively regarding the relations that theretofore had existed between him and his wife, the questions to which attention has been directed were proper cross-examination. (*People* v. *Gallagher,* 100 Cal. 466, 473 [35 Pac. 80] ; *People* v. *Buckley,* 143 Cal. 375, 386 [77 Pac. 169] ; *People* v. *Rozelle,* 78 Cal. 84 [20 Pac. 36] ; *People* v. *Maughs,* 8 Cal. App. 107, 117 [96 Pac. 407] ; *People* v. *Turco,* 29 Cal. App. 608 [156 Pac. 1001].)

The next asserted error of which appellant complains is to the effect that his defense was prejudicially affected by the fact that, in the presence of the jury, the trial judge made the statement that if the decapitation of the wife of defendant occurred in the course of an attempt that was made by him to commit the crime of mayhem, as a matter of law the result of the incident would be that defendant had committed the crime of murder in the first degree. From a reading of the transcript of the reporter's stenographic notes made with relation to the aforementioned statement, it is obvious that it was made inadvertently, but nevertheless in response to argument that immediately theretofore had been presented by counsel for defendant. Following a more specific explanation of the position which was assumed by counsel for defendant with respect to the point then under discussion, which explanation included the statement that section 189, Penal Code "refers to where a particular crime is attempted to have been committed, and a killing is committed in the attempted perpetration of another crime entirely", the judge said: " . . . —that was my understanding upon the conclusion of your argument, that the defendant did not intend to commit a homicide; that he might have intended to commit something else"; and "I do not follow the argument. So as to clear the record, let all the remarks by the Court be expunged from the record. The jury is instructed to disregard them. We are discussing merely possibilities and questions of law that have no relation to any facts in the case, based upon, perhaps, a misconstruction of the position of counsel for the defense." In such circumstances, it is clear that the jury could not have

been prejudicially influenced by the remarks to which appellant has objected.

The third specification of error made by appellant relates to asserted misconduct on the part of the deputy district attorney in that in his cross-examination of one of the alienists who testified as a witness in the action, he asked the question whether, in his opinion, "the defendant, at the present time is shamming or faking the condition which he apparently visualizes or shows himself to the ladies and gentlemen of the jury".

It appears that theretofore the alienist had expressed his opinion that defendant was sane at the time when the alleged murder was committed; also that, notwithstanding the apparently abnormal actions of defendant or his incoherent language in the courtroom, after the assertedly objectionable question had been asked, the opinion of the alienist was then the same as it was at the time when he expressed his original opinion. It is clear enough that eccentric action or speech on the part of defendant might have afforded some indication of his mental status; but it also is obvious that such deportment was not conclusive of the ultimate fact regarding his sanity. Such action or speech may have constituted but a deception or pretense on the part of defendant. In substance, the alienist already had given it as his opinion that at all times defendant was sane; which answer, as far as the abnormal conduct of defendant was concerned, very aptly implied that defendant was "shamming or faking". And if the alienist was qualified to express an inclusive opinion with reference to the sanity of defendant, this court can perceive no good reason why the same alienist was not also possessed of the legal capacity to express an opinion concerning any act or conduct of defendant that might constitute an element in the ultimate conclusion regarding his sanity. If that position is tenable, it should follow that the point presented by appellant cannot be sustained. But even though it should be considered as worthy of serious consideration, the fact that, following discussion of the point by respective counsel, the question was withdrawn, and that thereupon the jury was fully and carefully instructed by the trial judge to disregard the fact that the question had been asked and that argument had ensued regarding its pertinency and competency,—ef-

fectively cured any possible ill effect that, in the absence of such course, might have resulted.

On the asserted ground of their unconstitutionality, appellant attacks the entire group of sections 1016, 1020, 1026, 1026a and 1027 of the Penal Code, which relate to the right afforded a defendant in a criminal action to enter not only a plea of "not guilty", but also a plea of "not guilty by reason of insanity". Those provisions, or some of them, also purport to establish certain presumptions of fact and to adopt specified procedure with relation to such pleas. However, in connection with such contention, appellant makes the statement that he "fully realizes that the constitutionality of the dual trial has been considered in the following cases", citing *People* v. *Troche*, 206 Cal. 35 [273 Pac. 767] ; *People* v. *Leong Fook*, 206 Cal. 64 [273 Pac. 779], *People* v. *Dias*, 210 Cal. 495 [292 Pac. 459], and *People* v. *LaCrosse*, 5 Cal. App. (2d) 696 [43 Pac. (2d) 596]. To that list, the following cases might well be added, to wit: *People* v. *Perry*, 195 Cal. 623 [234 Pac. 890], *People* v. *Hickman*, 204 Cal. 470 [268 Pac. 909, 270 Pac. 1117], *People* v. *Coen*, 205 Cal. 596 [271 Pac. 1074], *People* v. *Sloper*, 198 Cal. 238 [244 Pac. 362], and *People* v. *Davis*, 94 Cal. App. 192 [270 Pac. 715].

In connection with the point thus presented, appellant particularly contends that even if, in accordance with the well-established law in this state, it be constitutional to require a separate trial as to each of the pleas of "not guilty" and "not guilty by reason of insanity",—nevertheless, the combined effect of the statutory provisions in substance that on the trial of the issue of "not guilty", the sanity of the defendant at the time when the offense was alleged to have been committed shall be conclusively presumed, aud the judicial construction of those statutes that because of such conclusiveness on a trial of that issue no evidence may be introduced to the contrary of such presumption, deprives the defendant of his constitutional rights in that he is not afforded "due process".

Were the "bald" question thus presented new in the jurisprudence of this state, it might present a basis for legal discussion herein. But considering the fact that each of the particular phases of the point to which attention has been directed by appellant heretofore has received consideration by this court and a conclusion reached with reference thereto that such contention is untenable,—unless this court should

now be prepared to recede from a position which for several years last past it has insistently maintained,—it necessarily follows that appellant's suggestion in that regard must be rejected.

Technically, perhaps, but nevertheless in accord with well-settled rules of procedure, another reason exists which may form a basis for a ruling contrary to appellant's contention. It not only appears as an indisputable fact, but also from statements contained in the brief of appellant that on his first trial (had upon the plea of "not guilty") he *"did not introduce evidence of his mental condition. . . .* Under the present interpretation of the conclusive presumption contained in section 1026 of the Penal Code, *this evidence is not admissible and was not offered in the trial on the 'not guilty' plea."* (Emphasis added.) Manifestly, in such circumstances, defendant is in no position to question the constitutionality of the statute. Notwithstanding that situation, it may be noted that on the trial had on the issue of "not guilty" the stringency of the rule to which attention has been directed was somewhat relaxed.

■ At the outset of the direct examination of defendant, the trial judge said: "I mean the relations between the defendant and the deceased are certainly material to the extent that they may aid the jury in determining what the *punishment* shall be. . . . And I am explaining the ruling, so that the position of the Court will be made manifest; and that is, at least for the purpose of placing before the jury the environment in which the parties lived, *their relations one to the other, the state of feeling between them,* and *whatever may have contributed to that,* are circumstances that in my opinion are proper to go before the jury to enable them *to assess the punishment. . . .* the testimony is admissible upon the theory that I have suggested, namely, that the jury must have before it the circumstances surrounding the parties to enable the jury to determine what the *punishment* shall be." (Emphasis added.) Thereupon, the defendant proceeded to and did testify to many facts and circumstances concerning the relationship which had existed between him and his wife. Among other things, he testified that the trouble between them had continued since 1935, when on an occasion of some argument his wife had spat in his face and threatened to kill him. On being questioned as to whether his wife had

ever struck him, defendant indicated that she had done so on each of several different occasions,—once having thrown a plate which injured his hand and which necessitated the taking of three stitches thereon; that she had hit him on the head with an iron bar; that she had thrown plates and knives at him, which broke the windows and doors of a store owned and operated by defendant; and that on one occasion she had come to the store and then and there threatened to kill him with an ice pick which she had concealed up her sleeve. He further testified that on the morning of the day the crime was committed, he left his place of business and went to the store (then being operated by her) with no intention of killing his wife, but merely to "scare" her; that he accused her of having been intimate with another man, whom he stated that he had observed leaving the house at 1 o'clock on the morning of the day when the killing occurred; that she did not deny the accusation, but defiantly declared that she would do as she pleased in that respect, as marital relations between them were ended; that she called him opprobrious names and vehemently asserted that he was "through", and spat at him again. She further stated: "I will send two persons to kill you;" also that she would get rid of him, either by sending him to the prison at San Quentin or to an undertaking parlor. At this juncture, defendant declared a "screen" came before his eyes; that he was very violent when he thought of the way he had been treated,—but that he would not have killed her if she had not called him names and spat in his face.

On cross-examination, defendant also testified further in detail regarding the killing of his wife. On being questioned in regard to the cleaver which he had carried with him to "scare" his wife, defendant testified that (induced by statements of his wife that she wanted to get rid of him) he had urged her to take the cleaver, but that she did not do so; that she was calling him vile names and spitting at him; that he was "blind" and did not know what he was doing; that thereafter on leaving the scene of the crime he became aware of the blood present on his hands and clothing, but did not know where it came from, and did not remember striking his wife, nor anything of what had happened. Upon his leaving the store, after the crime had been committed, defendant was questioned as to his reason for crossing the street, instead

of proceeding down the street on the side thereof on which the store was located and on which side of the street he had gone to the store (in which latter event he would have encountered a neighbor who was watering her lawn); and he testified that he did not know what direction he took, that he was "not in his right mind" and was not conscious of what he was doing.

In addition thereto, at a time when testimony was offered through another witness regarding an altercation that had occurred between defendant and his wife two years before the homicide was committed, in response to objection made thereto by the deputy district attorney, in part the trial judge said: " . . . And if the killing is as it has been indicated to be, that would not give excuse for the homicide, as far as it goes now. If you are offering this testimony for the purpose of excusing the homicide—if there is anything that happened, that counsel in good faith tells me, that anything happened in his conversation in 1935 between the defendant and the witness and the attorney that will excuse this homicide, and justify it, why, you can offer it subject to a motion to strike out. . . . I will allow that [referring to the statement that the wife had threatened the life of defendant] *for the purpose of mitigation* and it hasn't to do with the degree. It may come in for what it is worth; *but certainly it is admissible for the purpose of mitigation."* (Emphasis added.) In respect to such prior threat or threats, the witness testified that on the occasion of the proposed signing of an agreement between the defendant and his wife (and in the presence of witnesses), she had refused to sign the said agreement and asserted that everything belonged to her and that she would like to see Pasquale D'Angelo "out like a dog"; that in the argument that thereupon ensued the wife of defendant opened the drawer of a table beside which she was standing and pulled therefrom a large kitchen knife; that in that connection the witness had asked her what she was going to do, whereupon she was induced by the witness to drop the knife back into the case; that during such action on her part, defendant had stood, talking, "but he never made any bad move". With respect to that incident, the trial judge said: "I say it is properly coming in for the purpose *of showing mitigating circumstances.* Yes [referring to date, 1935]. In other words, this is the starting point; and, as I understand it, there had

been feeling between the two parties, and doubtless other testimony will come in more near in point of time; and its remoteness has to do with the weight. *Its weight will be for the jury.* It has to do in my judgment not for the purpose of fixing degree, but *for the purpose of establishing mitigation.*" (Emphasis added.)

Further testimony which was given by a lawyer, who formerly had represented defendant in a divorce action, disclosed facts regarding the conduct of, and statements that were made by, defendant early in the morning of the day when the crime was committed. He testified that defendant had berated and upbraided him for the reason that the attorney had failed to bring the divorce case to trial; that then defendant had "started to grit his teeth" and jerked open a cash register to show him some figures therein;—following which he loudly declared that he was being impoverished by the actions of his attorneys, and applied epithets to the witness, who at that point made his retreat from the place.

A third witness testified regarding a quarrel which had occurred between defendant and his wife about three years before she was killed. In part the witness stated that as he joined defendant and his wife on that occasion, the argument which then was in progress between them became more heated; that defendant's wife "made a move" toward the defendant; that as she did so he put out his hands to defend himself and she fell down; and that as she got up "there was a sort of an object that she had wrapped up in a newspaper, and when it fell, it fell with a sort of a thud"; but that when the object fell, the younger daughter (who was present) picked up this object right away and put it under her arm.

It thus indisputably appears that defendant was permitted to and did introduce evidence outside the immediate "circumstances connected with the offense" (*People* v. *Troche,* 206 Cal. 35, 47 [273 Pac. 767], and authorities there cited), all of which was expressly admitted "for the purpose of showing mitigation", and which also, in some respects, might have tended to establish the fact either that the killing constituted a murder in the second degree, or even that the crime of manslaughter was committed. And in that connection, the jury was not only instructed as to the law with respect both to first and second degree murder, but also was

told that, on the evidence adduced, it might find defendant guilty of the latter offense; furthermore, that in the event it should determine that defendant was guilty of first degree murder, the jury had the right to fix the penalty therefor at life imprisonment. Appellant does not contend that he was entitled to have the jury instructed with regard to the crime of manslaughter. From a complete reading of the testimony that was given by defendant, in which he detailed not only facts which related to his marital affairs which immediately preceded the killing, but also to those which later existed at or about the time when the homicide occurred, it is obvious that, although not so intended by either court or counsel, the issue of the sanity of defendant was indirectly injected into the trial had on the plea of ''not guilty'';—that is to say, that the apparently eccentric conduct of defendant, both preceding and at the time of the commission of the offense, could not have failed to suggest to the minds of the individual jurors some question with reference to the sanity of defendant. Since on the trial on the issue of ''not guilty'' defendant was not precluded from showing ''mitigating circumstances'',—but was given every opportunity to establish either that the offense was that of second degree murder, in that it was not committed wilfully, deliberately and premeditatedly, or possibly that the act constituted a voluntary manslaugher,—under the provisions of the several statutes to which attention has been directed, and particularly in consideration of the judicial interpretation or construction which has been given to such statutes, it results that with respect to the conduct of the trial court no error was committed by it with reference to the procedure of which appellant complains. In other words, with the exception of the right to introduce evidence which might relate directly to the insanity issue on the trial of the plea of ''not guilty'', every right of defendant was secured to his benefit that was legally possessed by him prior to the enactment of the several statutes which relate to the question of whether at the time when the offense was committed, defendant was legally sane; and as to that issue, since, by judicial interpretation, as attested either singly or by a combination of some or all of the several authorities in this state to which attention hereinbefore has been directed, the manner in or by which the entire trial was conducted was procedural only, and did not deprive defendant of any of

his just rights in the premises, it follows that none of his several contentions respecting a denial of ''due process'' may be sustained.

■ Finally, appellant presents the point that prejudicial error was committed by the trial court in that it denied defendant's motion for a new trial.

It appears that, in part, the motion for a new trial was based upon the asserted fact that since the trial had been concluded defendant had discovered new evidence that was material to his defense and which evidence, by the exercise of ordinary diligence, could not have been, nor was theretofore discovered by defendant. The materiality of such ''new'' evidence is said to relate principally to the issue of the sanity of defendant, and was addressed to evidence that was given on the trial by one of the alienist witnesses to the effect that if, preceding the killing of his wife, defendant had been afflicted by delusions respecting his wife's former conduct and actions with respect to defendant,—then, in the opinion of said alienist, defendant was insane. One of the assumed delusions of defendant which was contained in a hypothetical question which was propounded to the alienist was: '' . . . that the man [defendant] believed that he called the police on several occasions for protection from his wife, which belief was contrary to the fact; . . . '' On the hearing of the motion for a new trial, the substance of the material part of one of the affidavits that was presented to the trial court was that, shortly before the homicide occurred, defendant told one of the affiants that he was in fear of his life and was afraid that a person by the name of Don Hunt would kill him or at least do him great bodily harm; that he employed the affiant to act as a bodyguard for him on five occasions during the month of May, 1938; and that, in compensation therefor, defendant paid to affiant the sum of $54, during the period May 15 to 19, 1938. The other affidavit contained the assertedly material statements that, in defendant's beer tavern, on or about May 15 (1938), a man by the name of Don or Dave went into the beer tavern and started a quarrel with defendant; that the said person went back of the bar and struck defendant, knocked him to the floor and then continued to strike and to choke him as he was prostrate; and affiant stated that thereupon it was necessary for him to strike the said person on the head with a stool in order to prevent

him from doing serious bodily harm to defendant; that a day or two later affiant told Rosa D'Angelo (wife of defendant), in the presence of her daughter Viola, what had occurred on the occasion just described, and the daughter stated to affiant in the presence of her mother that affiant should not have interfered; and the daughter asked affiant why he had not allowed the person to kill defendant; that at said time and place said Rosa D'Angelo acquiesced in the statement made by her daughter; also, that on or about the 28th day of May, 1938, a man by the name of Harry Marshall came into the beer tavern operated by defendant and started an argument with the latter, and in the course of the argument Marshall threw at least a dozen eggs, one at a time, at defendant and also at the back bar and bottles of liquor thereon.

Considering the contents of such affidavits, together with the fact that on each of several occasions the wife of defendant had threatened him with personal violence, either by herself or through others, and actually had physically assaulted him, it becomes clear that defendant was justified in having at least a suspicion that his wife was the instigator of each of the unprovoked assaults to which reference was made in the two affidavits; and that if, on the insanity trial of defendant, evidence of the said assumed facts had been placed before the jury, it is extremely improbable that the verdict would have been different from that which the jury returned on said issue. At any rate, in the exercise of its sound discretion in the matter, the order that was made by the trial court, by which the motion for a new trial was denied, did not amount to prejudicial error.

No other points are suggested by appellant as affording impelling reasons for a reversal of the judgment or the order by which a new trial was denied.

Defendant had a fair trial. It is ordered that the judgment and the order be and they are affirmed.

Rehearing denied.