[Crim. No. 9032.   Second Dist., Div. One.   Mar. 31, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. OSCAR WILBUR SCHMIDT, Defendant and Appellant.

Leon Mayer for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Defendant was convicted by a jury of attempted arson.

Around 6:45 p.m. on October 4, 1962, two employees of Forest Lawn Cemetery, Reid and Pacheco, saw defendant sitting in his car on a service road for employees in a restricted area near "Abiding Love." He told them he had a claim there since 1911; Reid advised him the cemetery had closed at 6 p.m., whereupon defendant started out of the park. Shortly thereafter they saw him again drive up the dirt road toward "Abiding Love" and stop; parked in their truck at the bottom of the hill about 100 yards away, they watched him run or walk quickly into a brush thicket in an undeveloped part of the cemetery. Then Pacheco saw him come out of the brush, get into his car and drive off; they followed him to the gate. Upon returning to the brush thicket they found, placed in the leaves at the bottom of the brush (Ex. 1), three match packets tied together with a string, a lighted cigarette between them (Exs. 3, 4, 5). The soft ground around the matches showed defendant's footprints. Ten minutes later they again saw defendant; he was about one-half mile away on a higher level which looked down on the area. Where the match device was found there was heavy brush and a lighter brush of wild oats and California buckwheat. The match contraption is commonly used as an incendiary device; the cigarette will consume itself and light a fire in from 15 to 20 minutes. Had the cigarette ignited the matches it would have started a fire.

Having identified defendant by the license number of his car, Officer Winter, arson unit, Los Angeles Fire Department, and his partner went to defendant's home around 9:30

p.m.; he was not in. He returned about 2 a.m. (October 5); they talked to him in front of his home. Winter asked him what he had been doing on the afternoon of October 4. Defendant told them that he drank heavily in the afternoon, had a fight with his wife around 5 p.m., and went to Forest Lawn to visit the grave of an old friend, Ray Daniels, who had died nine years ago, but this was the first time he went and didn't find the grave; and that he also had gone into the area to prospect and had been in the brush prospecting— this was his hobby. When asked if he attempted to start a brush fire, he said, no, he did not, not to his knowledge. He denied any knowledge of the match device and "setting this trap." Finally, he said he had been drinking quite heavily and did not remember anything; asked if he had periods in which he blacked out, he told the officers that when he drank heavily he would black out on occasion, but had never had medical attention for this condition although he felt he needed help. He repeated this and, "I must be some kind of nut" several times on the way to the station. An examination of defendant's car revealed no prospecting tools; on his person they found two books of matches and regular-size cigarettes. Defendant was very talkative; he talked constantly for an hour in front of his house and after his arrest. Later in the day defendant told Winter he was a complete blackout and didn't recall anything.

In his defense, one Coyne testified he had known defendant since 1955, prospected with him on as many as 30 outings a year, and never heard of defendant's having blackouts of any kind. Defendant's wife, a registered nurse, testified that on October 15 she opened the trunk of the automobile and found prospecting equipment; during her married life with defendant she had never seen him go through a "blackout situation"; the last time she saw him on October 4 was around 5 p.m. — he had been drinking and they had a quarrel about his going out at that time of day to look for work; his glasses were scratched when she saw them on October 9, but not prior to October 4; and she buys books of matches at the grocery store, and exhibit 9 could be similar to them.

We relate the bulk of defendant's testimony, for it reflects the preciseness with which he detailed his activities on October 4. He denied that he had anything to do with the match and cigarette device found in Forest Lawn on October 4, or attempted to start a fire there. He testified that on October 4 he painted a portion of his apartment, took his wife to work,

drank "one drink, one or two" in the afternoon, picked up his wife at work, had a tiff with her and left the apartment; he started to go out to some plants that work nights but he felt depressed and drove to Forest Lawn where he had been twice before; he thought he knew the locality of Daniels' grave; he had worked with Daniels in 1953-54 and gone prospecting with him on many occasions, and in the area now part of the cemetery at Griffith Park; they had discussed buried treasure in the area and he had a belief concerning it; he arrived at the cemetery around 5:30 p.m. but did not attempt to go to any personnel to ask the location of Daniels' grave; he had prospecting tools in the trunk where he always kept them; he parked about 50 feet up a service road, sat for a while looking over the valley and then checked some grave markers; he walked across the lawn to the top of the hill looking for a land mark of the old Warner Ranch (he believes there was treasure, taken in a stage coach robbery in Cahuenga Pass in the middle 1800's, buried in that area); when looking around in this area he walked down a gravel road, lost his footing and fell; he went back to the car and as he drove away he talked to someone in a pickup truck; as he started out of the cemetery he discovered his glasses were not in his shirt pocket so he returned to the area and parked his car to look for them; he used several matches while searching, found the glasses and left; he did not speed away; then he intended to go to some machine shops to see if any work was available; later he stopped at Ginos and Robert's Drive-in and did more drinking than he should have. He testified further that when he got home he met the officers and told them his whereabouts; he attempted to answer all questions; he did not deny he had been to Forest Lawn; it is possible that during the conversation the officers mentioned blackouts but he did not; he did tell them that while he was drinking rather heavily his wife told him the next day he used some pretty bad language which he did not remember. He denied he told the officers that he ever suffered from periods of unconsciousness or blackouts, or was a complete blackout and couldn't recall what he did; when he stated to the officers that to his knowledge he didn't attempt to start any fires, he was referring to the time he was lighting matches to look for his glasses; when shown the match device he told the officers he did not know anything about it; his glasses were not scratched before he went to Forest Lawn but they could have been scratched when he dropped them in the cemetery when

he fell or when they were booked with his property and keys; he did not see the officers search the trunk of his car but his prospecting equipment was there; he never attempted to set a fire at Forest Lawn. Defendant admitted the conviction of two felonies — grand theft (1945), and violation of section 12021, Penal Code (1959). He denied he told Winter he was "some kind of nut," or that he occasionally got blackouts when drinking and did not remember what he was doing; and while he admitted he told the officers he needed medical attention, it was not for blackouts.

After conviction the court, at defendant's request appointed a psychiatrist to examine him; his report and counsel's affidavit of due diligence were submitted on motion for new trial. Counsel argued there was newly discovered evidence, based on the psychiatrist's report, that defendant had "acted without full conceptual awareness" at the time of the offense, thus, there was a possibility that either he did not have the ability to form a specific intent or was unconscious at the time. The motion was denied. The sole issue before us is whether the trial court erred in denying the motion for new trial.

The granting or denial of a motion for new trial on ground of newly discovered evidence rests in the sound discretion of the trial court. (*People* v. *Greenwood*, 47 Cal.2d 819 [306 P.2d 427]; *People* v. *Beard*, 46 Cal.2d 278 [294 P.2d 29].) Such motions are looked upon with disfavor, and the trial court's ruling thereon will not be disturbed except on a clear showing of an abuse of discretion. (*People* v. *Greenwood*, 47 Cal.2d 819 [306 P.2d 427]; *People* v. *McGarry*, 42 Cal.2d 429 [267 P.2d 254]; *People* v. *Miller*, 37 Cal.2d 801 [236 P.2d 137].)

According to statute, the trial court may grant a new trial. "... When new evidence is discovered material to the defendant and which he could not, with reasonable diligence, have discovered and produced at the trial. ..." (Pen. Code, § 1181, subd. 8.) However, certain requirements must be fulfilled for granting a new trial on this ground: "... (1) the evidence and not merely its materiality must be newly discovered; (2) the evidence must not be merely cumulative; (3) a different result must be probable on a retrial of the cause; (4) the party could not with reasonable diligence have discovered and produced it at the trial; (5) these facts must be shown by the best evidence which the case admits. (*People* v. *Sutton*, 73 Cal. 243, 247 [15 P. 86]; *People* v. *Beard*, 46

Cal.2d 278, 281 [294 P.2d 29]; *People* v. *Warren*, 175 Cal. App.2d 233, 245 [346 P.2d 64].)'' (*People* v. *Norman*, 177 Cal.App.2d 59, 67 [1 Cal.Rptr. 699].) See also *People* v. *Nothnagel* 187 Cal.App.2d 219, 225 [9 Cal.Rptr. 519].

■ The report of the psychiatrist — that defendant ''acted without full conceptual awareness'' can hardly be classed as ''new evidence . . . which he [defendant] could not, with reasonable diligence, have discovered and produced at the trial.'' (§ 1181, subd. 8.) It satisfies none of the necessary requirements.

■ While defense counsel may have chosen to disbelieve Winter, it cannot be denied that the People produced at the trial credible evidence in the form of Winter's testimony — that twice defendant claimed to him that he had been drinking heavily, had suffered blackouts when drinking, for which he needed medical help, and ''was a complete blackout and didn't recall anything'' — not only putting defense counsel on notice, but making the information available to him even before the prosecution rested which could have been explored by the psychiatrist then to discover if such a condition had in fact existed and if it had, produced it in his defense. But to the contrary, he made every effort to prove, not only that Winter's testimony was false, but that such condition never existed, ignored the evidence, and chose to rely solely upon a defense diametrically opposed to any suggestion of ''blackout'' — that defendant knew what he was doing on the afternoon of October 4 and did none of the acts of which he was accused. Only after he failed to convince the jury and defendant was convicted did counsel ''discover'' the evidence and ''produce'' the same. While counsel may have exercised poor judgment in pursuing the course he did, the ''evidence'' offered on the motion ''could have [and, in fact, was] discovered'' and could have been produced by him at the trial. We agree with the trial judge that defendant is ''grasping at straws.''

Officer Winter's testimony is clear. He said that defendant twice claimed a ''blackout'' because of drinking and could not remember what he did on the afternoon of October 4. Prior to his arrest defendant told Winter he had been drinking heavily in the afternoon before he went to the cemetery and did not remember anything; when he drank heavily he would blackout on occasion. Asked by Winter if he ever had any medical attention for his condition, defendant answered, no, but several times said he felt he needed help and added,

"I must be some kind of nut." After his arrest defendant said he was a complete blackout and didn't recall anything. At that time, defense counsel obviously considered this testimony to be unfavorable to his client and damaging to the defense he sought to interpose, and accordingly made every effort to affirmatively establish, first that such a "blackout" condition did not exist, and second, that Winter's testimony was false. Thus, in aid of his defense, he, on direct examination elicited from his witness Coyne that he never heard of defendant having blackouts of any kind; from defendant's wife, a registered nurse, that during her married life she had never seen defendant go through a "blackout situation"; and from defendant that he never suffered from blackouts, and emphatic and repeated denials that he ever told Winter he suffered from periods of unconsciousness, occasionally got blackouts, and was a complete blackout and didn't recall anything.

Moreover it is improbable that a verdict in a retrial would differ from the one at bar. The psychiatrist's opinion that defendant "acted without full conceptual awareness" is not only based, in part, upon defendant's ingestion of alcohol on October 4, but is diametrically opposed to the defense he offered under oath at the trial—that he knew everything he did on that day and did not attempt to set the fire. As to his ingestion of alcohol on October 4 before he went to the cemetery, defendant testified he had only "one drink, one or two"; at no time in his testimony did he claim, nor does his evidence show, that he drank more, drank heavily, was intoxicated or drunk, suffered a blackout or could not remember what he did. Finally, under oath, defendant recalled precisely and in great detail his activities immediately before and while he was in the cemetery — what he thought, where he went, why he went there and what he did while there. Indeed, the trial judge was prompted to comment, "Both the People's evidence and the defendant's evidence show that the defendant was fully aware of what he was doing." Upon a retrial, it is doubtful that defendant could surmount the devastating impeachment he would be certain to face were he to take the stand and claim he suffered a blackout and could recall nothing. Should defendant refuse to testify, Winter's testimony would still show the preciseness in detail with which he described to Winter what he did on October 4, which would go far to controvert any evidence that he acted "without full conceptual awareness."

Finally, the best evidence that defendant acted without full conceptual awareness, would be defendant's affidavit asserting his condition on October 4. But, defendant elected not to submit such information under oath; thus, all the trial judge had before him on the motion was defendant's trial testimony vigorously denying he ever suffered blackouts or told the officers he did, and the psychiatrist's report based primarily upon the story defendant told him while not under oath, *after* his conviction.

Having taken one course at the trial and failed, counsel herein seeks a second chance to present a new defense — one contrary to and wholly incompatible with that presented under oath at the trial. While we are not here concerned with the issue of insanity, the rules set up in *People* v. *Saunders,* 13 Cal.App. 743 [110 P. 825], and *People* v. *D'Angelo,* 13 Cal.2d 203 [88 P.2d 708], control. In the former case the court refused a new trial to permit defendant to raise the *new* defense of insanity (*People* v. *Saunders, supra*); and in the latter, a motion for new trial was denied refusing to allow *additional* evidence of insanity. (*People* v. *D'Angelo, supra.*)

There is nothing in the record to suggest that the trial court abused its discretion in denying defendant's motion for new trial. The purported appeal from the order denying the motion is dismissed. The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.