[Crim. No. 4840.   In Bank.   Jan. 25, 1949.]

THE PEOPLE, Respondent, v. WESLEY ROBERT WELLS, Appellant.

Philip C. Wilkins and C. K. Curtright for Appellant.

Fred N. Howser, Attorney General, David K. Lener, Clarence A. Linn, Deputy Attorneys General, John Quincy Brown, District Attorney, Albert H. Mundt, Chief Deputy District Attorney, and Oscar A. Kistle, Deputy District Attorney, for Respondent.

SCHAUER, J.—Wesley Robert Wells appeals from a judgment entered upon a jury verdict that he is guilty of violation of section 4500 of the Penal Code, and from an order denying his motion for new trial. Section 4500 provides that certain kinds of assault committed by life-term prisoners "with malice aforethought" are capital offenses. Defendant contends: (1) Section 4500 was never intended to apply to persons, such as he, serving an unfixed, indeterminate sentence for a maximum term of life imprisonment, and to apply it to him is to deprive him of equal protection of the laws in violation of the Fourteenth Amendment of the federal Constitution. (2) The indictment was returned upon insufficient evidence and is therefore void. (3) The trial court erred to his prejudice by admitting evidence of misconduct of defendant prior and subsequent to the offense charged. (4) The trial court erred to his prejudice by excluding evidence of medical experts offered to show that he did not act with "malice aforethought." For the reasons hereinafter stated we conclude that contentions (1), (2) and (3) are not sustained; as to contention (4) we conclude that the proffered evidence should have been received but that the error in rejecting it is not prejudicial.

(1) *Applicability and Constitutionality of Section 4500 of the Penal Code*

Section 4500 provides, in material part, that "Every person undergoing a life sentence in a State prison of this State, who, with malice aforethought, commits an assault upon the person of another . . . by any means of force likely to produce great bodily injury, is punishable with death." Defendant at the time he allegedly violated section 4500 was undergoing an indeterminate sentence for violation of section 4502 of the Penal Code (which proscribes the possession of weapons by inmates of state prisons). The minimum term of

imprisonment for violation of section 4502 is five years; the statute provides no maximum term of imprisonment and none had been fixed by the Adult Authority. Therefore, under the settled law of this state, defendant was, in effect, "undergoing a life sentence" within the meaning of section 4500. (*People* v. *McNabb* (1935), 3 Cal.2d 441, 456-458 [45 P.2d 334]; *People* v. *Williams* (1945), 27 Cal.2d 216, 219 [163 P.2d 441].) Defendant urges that the reasoning of the McNabb case is faulty and that the problem should be reexamined and the McNabb and Williams cases should be overruled.

In 1901, the statute now numbered section 4500 was enacted as section 246 of the Penal Code. The contention that the statute denied to life-term prisoners the equal protection of the laws was rejected in *People* v. *Finley* (1908), 153 Cal. 59, 62 [94 P. 248], affirmed in *Finley* v. *California* (1911), 222 U.S. 28, 31 [32 S.Ct. 13, 56 L.Ed. 75]. This court pointed out, as reasons for separately classifying "life-termers," that their term of imprisonment could not be shortened by virtue of their good conduct and that the offenses for which life sentences were imposed were usually more serious and showed "more abandoned and malignant hearts" than the offenses of those sentenced for terms of years. The Supreme Court of the United States added that "life-termers" could not be further punished by increasing their terms of imprisonment and the Legislature could fix death as appropriate additional punishment for offenders in such class.

Thereafter, in 1917, this state, in furtherance of the policy of placing before prisoners the incentive to do well, adopted the indeterminate sentence law (*In re Lee* (1918), 177 Cal. 690, 692-693 [171 P. 958]). The prisoner whose term has not been fixed by the Adult Authority has since been regarded as, in effect, serving the maximum term—in defendant's case, life—in order that the sentence be not void for uncertainty (id.). According to the McNabb (1935) case, *supra*, page 457 of 3 Cal.2d, the question whether an unfixed term such as defendant's "is in law a life sentence . . . was definitely settled by *In re Lee*, . . . and has been the pronounced law of the state since. Every person is charged with a knowledge of its existence. The fact that section 246 of the Penal Code was adopted in 1901, at a time trial courts pronounced a fixed term of imprisonment, can in nowise affect the operation of the present rule of law as declared in *In re Lee*, *supra*." This holding is approvingly referred to in *People* v. *Jones* (1936), 6 Cal.2d 554, 556 [59 P.2d 89]; *People* v. *Ralph* (1944), 24

Cal.2d 575, 578 [150 P.2d 401]; *In re Quinn* (1945), 25 Cal. 2d 799, 803 [154 P.2d 875]; and *In re Cowen* (1946), 27 Cal. 2d 637, 648 [166 P.2d 279]. In 1941, section 246 was repealed and reenacted, in identical wording, as section 4500. *People* v. *Williams* (1945), *supra,* 27 Cal.2d 216, 219, reiterates the holding of the McNabb case that such statute applies to one in defendant's situation.

Defendant urges that the holding of the McNabb case does not take into consideration the change in the composition of the class known as life-term convicts which occurred in 1917 with enactment of the indeterminate sentence law. No longer, defendant says, is the class composed of the hopeless and therefore dangerous men to whom the Finley opinions refer and whom the Legislature had in mind when it enacted section 246.[1] It is true that inclusion in the life-term class of those whose terms are in maxima life imprisonment but which terms the Adult Authority has power to ultimately fix in spans of years, means that the class must be regarded as containing at least some persons who will have the incentive of hope for reward of good conduct, as well as the fear of death as punishment, to deter them from committing the offense defined in section 4500. But we cannot agree that enactment of the indeterminate sentence law, as construed and applied, destroys the rationality of the classification originally made by section 246 and continued by reenactment as section 4500. The purpose of that section—prison discipline and protection of guards and inmates—still constitutes a cogent reason for its enactment. Adding the hope of reward for good conduct to the fear of punishment for evil, does not destroy the cogency of the reason for the legislation. The validity of the classification is to be presumed. (*Lelande* v. *Lowery* (1945), 26 Cal.2d 224, 232-233 [157 P.2d 639, 175 A.L.R. 1109].) It may also be observed that the Adult Authority, when it determines and redetermines the length of time a person is to be imprisoned or when, as in defendant's case, it considers the matter and acts by refraining from reducing such length of time to a term of years, acts with knowledge of the person's conduct as a prisoner as well as the conduct which led to his imprisonment and his social background. The actual working basis for the classification of persons as life-term prisoners today, therefore, in cases wherein the Authority has acted, has even

---

[1] A similar argument was accepted by the Supreme Court of Utah in *State* v. *Nemier* (1944), 106 Utah 307, 318-319 [148 P.2d 327, 332], Mr. Justice Larson dissenting.

more substantial relation to the purpose of section 246 than it did when the prisoner was sentenced to a life term by a judge who could not foresee how the convicted man would react to his imprisonment. As already indicated, the question of the applicability of section 4500 to a person whose maximum term is life imprisonment where the term could be, but has not been, set at a span of years is not an open one; we think that it is firmly concluded by the cases above cited coupled with the action of the Legislature in reenacting the statute in 1941 after its construction in the earlier cases. Furthermore, regardless of precedent, it seems reasonable to conclude that section 4500 is and should be applicable to such prisoners as defendant, who, regrettably, during his service of time in prison appears to have become less and less amenable to discipline and susceptible of reform.[2] We are satisfied that section 4500 covers the case here presented and that its application to defendant infringes no constitutional limitation.

## (2) *The Indictment*

Defendant contends that two essential allegations of the indictment—that he committed the assault with "malice aforethought" and that he was then "undergoing a life sentence"—were not shown to the grand jury by any competent evidence and therefore the indictment is void and the court was without jurisdiction to try him. (See *Greenberg* v. *Superior Court* (1942), 19 Cal.2d 319, 322 [121 P.2d 713].) This contention was timely raised by a motion to quash the indictment, which was denied, a demurrer thereto, which was overruled, and by application to this court for an alternative writ of prohibition, which was denied without written opinion (*Wells* v. *Superor Court* (1947), Sac. 5880). On each such occasion the contention was properly rejected.

---

[2]That defendant is in fact the sort of prisoner to whom section 4500 should apply appears to be indicated by the nature of certain of his prior felony convictions and by certain other offenses committed by him in prison. In 1931, he was convicted of manslaughter committed while he was an inmate of Folsom State Prison. In 1944, he struck a prison doctor. Also in 1944, he was convicted of possessing a knife while he was a prisoner in Folsom State Prison, a violation of section 4502 of the Penal Code. (The opinion of the District Court of Appeal affirming such conviction discloses that defendant on that occasion used such illegally possessed knife to injure seriously a fellow prisoner. *People* v. *Wells* (1945), 68 Cal.App.2d 476 [156 P.2d 979].) In February, 1945, defendant assaulted certain guards with an iron rod torn from his bedstead and attempted to wrest a cane from an officer. In April, 1945, defendant committed a battery with his fist upon a guard.

338

■ "Malice aforethought is a term ordinarily used in connection with the felonious killing which is murder to designate it from manslaughter. The words do not imply deliberation or the lapse of considerable time between the malicious intent to take life and its actual execution, but rather denote *purpose* and *design* in contradistinction to accident and mischance. (See Bouvier's Law Dictionary, vol. 2, p. 2068.) In our statute [Pen. Code, former § 246, now § 4500] it is used to denote the purpose and design of the assaulting party." (*People* v. *McNabb* (1935), *supra*, 3 Cal.2d 441, 456; see also *People* v. *Holt* (1944), 25 Cal.2d 59, 70 [153 P.2d 21] ; *People* v. *Thomas* (1945), 25 Cal.2d 880, 901 [156 P.2d 7] ; *People* v. *Bender* (1945), 27 Cal.2d 164, 180-181 [163 P.2d 8].) The word "malice" imports "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." (Pen. Code, § 7, subd. 4.) A malicious intent is to be presumed "from the deliberate commission of an unlawful act, for the purpose of injuring another." (Code Civ. Proc., § 1962, subd. 1.)

■ The record clerk of Folsom State Prison testified before the grand jury that defendant was held under a commitment for violation of section 4502, which was punishable by an indeterminate term of from five years to life; that defendant's term had not been fixed by the Adult Authority; and that defendant was therefore carried on the prison rolls as a "lifetermer." The following evidence of the circumstances of the crime was before the grand jury: Noble Brown, a prison guard, was the victim of the assault. Prior to the commission of the offense Brown had preferred charges of misconduct against defendant. Defendant was taken before prison officials for a hearing on the charges. He became angry, insolent and noisy and the warden directed him to leave the hearing room. This, defendant did. In the hall outside the room defendant sat down on the floor and refused to go to his cell. Brown then came from the room and walked along the hall. Defendant seized a heavy crockery cuspidor and threw it at Brown. The cuspidor, apparently as defendant was swinging it in the course of throwing it at Brown, struck two other officers (who were near and to the rear of defendant endeavoring to stop him) and then hit Brown with great force, injuring him severely.

It is said in the Greenberg case, *supra* (p. 321 of 19 Cal. 2d), "A grand jury's function is to return an indictment against a person only when the evidence presented to it indi-

cates that he has committed a public offense.'' The above summarized evidence indicates that defendant committed the charged public offense.

### (3) Evidence of Misconduct of Defendant on Other Occasions

It is the theory of the prosecution that defendant committed an aggravated assault upon Officer Brown in a spirit of revenge—which would constitute malice aforethought—because Brown had reported to the warden that defendant had broken prison rules by cursing Brown and by ''creating a disturbance.'' (Defendant committed the latter violation of prison rules on the night before his scheduled hearing on the charge of cursing an officer. He beat his iron bed against the steel floor, and shouted and cursed because a lieutenant with whom he had asked to speak did not come to his cell within the time limit he set. See footnote 6, *post,* p. 358.) Defendant, on the other hand, testified that he had no intent to strike Brown; that after he sat down in the corridor and refused to return to his cell he informed Officers Robinson and Hogan, who were escorting him, that they were ''yellow dogs''; that Robinson ''took offense'' and struck defendant with his baton; that defendant picked up the cuspidor to defend himself; that ''I caught it [the blow of a guard's baton] behind the head, I fall forward and release the cuspidor. I ain't saying whether I threw it, or it slipped out of my hands, but I think I threw it as I fell'' and it struck Brown, who, defendant said, he did not know was present.

Evidence of prior and subsequent misconduct of defendant toward prison guards other than Brown was first offered as part of the prosecution's case in chief as tending to prove the essential element of ''malice aforethought'' in the commission of the assault. Specifically the prosecution sought to establish that the defendant bore and expressed malice toward the entire class of custodial officers; that defendant had a fixed purpose ''to avoid the rules of the institution and conduct himself as he saw fit, and if any officer of the institution had the effrontery to report him, which would occasion disciplinary action, he [defendant] would take punitive action himself.'' The trial judge at this stage of the proceeding, apparently acting under some misapprehension as to the state of the record or as to the law governing the admissibility of evidence of prior misconduct, denied the offer of proof but

such denial was with the reservation "you may renew it at any time during the course of this trial."

Thereafter, on redirect examination, defendant testified that he "got along" with the prison officers and that he had no prejudice against the guards as a class. The prosecution was then permitted to introduce evidence of misbehavior of defendant toward guards on other occasions. When defendant's counsel objected to such evidence, the trial court ruled, "you opened it up when you asked him about his attitude toward the officers there." This was not a proper basis for the ruling. "The argument that defendant's counsel 'opened the gates' is unavailing . . . Legitimate cross-examination does not extend to matters improperly admitted on direct examination. Failure to object to improper questions on direct examination may not be taken advantage of on cross-examination to elicit immaterial or irrelevant testimony." (*People* v. *McDaniel* (1943), 59 Cal.App.2d 672, 677 [140 P.2d 88].)

Neither is it within the proper scope of impeachment to show that a witness has given false testimony as to a matter which could not be proved independently in the case. (*People* v. *Chin Mook Sow* (1877), 51 Cal. 597, 600; *People* v. *McKeller* (1878), 53 Cal. 65; *People* v. *Bell* (1878), 53 Cal. 119; *People* v. *Dye* (1888), 75 Cal. 108, 111-112 [16 P. 537] ; *Davis* v. *California Powder-Works* (1890), 84 Cal. 617, 627 [24 P. 387] ; *People* v. *Tiley* (1890), 84 Cal. 651, 654 [24 P. 290] ; *Moody* v. *Peirano* (1906), 4 Cal.App. 411, 416 [88 P. 380] ; *People* v. *Factor* (1932), 125 Cal.App. 618, 621 [13 P.2d 984] ; *People* v. *Pollock* (1939), 31 Cal.App.2d 747, 757 [89 P.2d 128] ; *People* v. *Burness* (1942), 53 Cal.App.2d 214, 220 [127 P.2d 623].) We must, therefore, determine whether the evidence was admissible for a proper purpose.

The prosecution was allowed to put in evidence the following matters (it did not seek to show details of the various instances of misconduct) : On December 24, 1937, defendant cursed a prison officer. On October 9, 1938, defendant cursed a guard. On April 16, 1939, defendant threatened a guard. On October 9, 1939, defendant was insolent to the turnkey. On November 21, 1939, defendant cursed a guard. On November 18, 1940, defendant was placed in solitary confinement because he had again cursed a guard. In December, 1944, defendant was placed in solitary confinement because he struck a prison physician. In January, 1946, defendant "had an altercation with Mr. Harwood [a prison official] in the laundry." On April 3, 1946, defendant threatened Captain

Deitz. On March 1, 1947, defendant was confined in "segregation" because he had cursed a guard. A few days before the assault of which defendant was convicted, Guard Schaeffer had filed a charge of cursing an officer against defendant; defendant had complained that the charge was false and had threatened to "even the score with him by tearing his head off one of these days." On July 26, 1947 (after the offense of which he has been convicted), defendant threatened to and did throw a bucket containing "body secretions" at Officers Gage, Rossi and Sweasy.

The prosecution was also allowed to prove in detail a series of incidents which took place in 1945 and which were somewhat similar to the 1947 events which resulted in the instant charge. On February 12, 1945, defendant notified the officer in charge of the area where he was confined that he wished to see a captain. When the captain did not come at once defendant threatened to and shortly thereafter did "destroy his cell"; he "broke out the toilet and tore down the wash basin," dismantled his bed and when guards attempted to remove him to another cell he held a piece of the iron bedstead in a threatening manner and said, "Don't come in this cell." After some conversation defendant was induced to go to another cell but when he entered it he attempted to take a cane from one of the officers. Another officer, Jensen, thereupon struck defendant a single severe blow on the head with his baton. Jensen did not see defendant again until April 4, 1945. On that day defendant was to appear before the Adult Authority. Jensen was in charge of admitting prisoners to the hearing room. He opened a gate; defendant with two officers came through the gate; and defendant, without a word, struck Jensen two severe blows with his fists. Defendant testified that he thus attacked Jensen in revenge because Jensen had previously struck him.

The evidence of such other instances of misconduct was not admitted for the improper purpose of showing that defendant, because he had done many bad acts, was a bad person likely to do other bad acts, and, therefore, probably committed the crime charged.[3] Rather, it was admitted in

---

[3] As to the above summarized evidence the jury were instructed that "evidence of assaults, threats and altercations allegedly engaged in by the defendant other than the assault alleged to have been committed on Noble E. Brown has been admitted only as such evidence may tend in your minds to prove any material fact or facts relating to the offense charged in the indictment. If the evidence of other alleged assaults, threats and altercations is believed by you and tends, in relation to the offense charged

342

order that the jury, if they believed it, might draw the following proper series of inferences: Because defendant, at various times during the 10 years before and at a time about three months after commission of the offense charged, expressed, by words and acts, feelings of hostility toward various custodial officers, he probably felt hostility and bore malice toward the class of custodial officers. Therefore, he probably was hostile to Brown, a member of the class against which his animosity was directed. Therefore, defendant probably injured Brown with "malice aforethought" rather than by accident while engaged in actions prompted by honest fear for his own (defendant's) safety. More particularly, the "Jensen incident," similar in its circumstances to the present incident, permits the inference that since defendant had once availed himself of an opportunity to inflict physical vengeance upon a guard who had participated in disciplining him, it was probable that when defendant injured another guard who had brought disciplinary charges against him he did so in a spirit of vengeance, not accidentally or because of honest fear. (Illustrating, although not always expressly recognizing, application of these principles, see *People* v. *Walters* (1893), 98 Cal. 138, 140-141 [32 P. 864]; *People* v. *Craig* (1896), 111 Cal. 460 [44 P. 186]; *People* v. *Wilson* (1897), 117 Cal. 688, 691 [49 P. 1054]; *People* v. *Teixeira* (1899), 123 Cal. 297 [55 P. 988]; *People* v. *Gross* (1899), 123 Cal. 389 [55 P. 1054]; *Peats* v. *State* (1938), 213 Ind. 560, 573 [12 N.E.2d 270]; *Dietz* v. *State* (1912), 149 Wis. 462 [136 N.W. 166, Ann.Cas. 1913C 732].)

In the last-cited (Dietz) case the charge was murder, in that defendant killed a sheriff who sought to arrest him. Evidence of assaults upon and resistance to arrests by law enforcement officers over a period of seven years was admitted to negative defendant's claim that he believed he was defending himself against a wrongdoer. In the opinion it

in the Indictment, to establish malice aforethought, motive, intent, scheme or design, in your minds, you should consider it. If it does not tend to establish malice aforethought, intent, motive, scheme or design, in your minds, you should disregard it. Such evidence, if believed by you, may only be considered for that purpose. The evidence was not admitted to prove and must not be considered by you as tending to prove or indicate that the defendant is or was the kind of person who would be more likely to have committed the crime charged in the Indictment."

This instruction is quoted, not as a model of excellence, but to show that the trial judge, although he originally gave a wrong reason for his ruling admitting the evidence, upon reflection appreciated and adequately advised the jury of the proper purpose for which such evidence was admissible.

is explained that (pp. 469-470 of 149 Wis.) "The principle on which such evidence is received to show intent or state of mind is simply the principle which the human mind instinctively applies in ordinary affairs of life. If the question be whether a given act was accidental or intentional, the fact that the actor has at numerous times performed similar acts under circumstances forbidding the idea of accident is very strong proof that the act under investigation was also intentional.

"Mr. Wigmore in his work on Evidence (vol. 1, § 302 [3d ed., vol. 2, p. 196]) thus very clearly states the idea:

" 'In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense, or good faith, or other innocent mental state, and tends to establish (provisionally at least, though not certainly) the presence of the normal, *i.e.*, criminal, intent accompanying such an act.'

"It is true that some of the acts of resistance to arrest in the present case were remote in point of time from the act under investigation, but that does not of itself render such evidence incompetent, especially where, as here, the acts were repeated year after year down to a comparatively recent period, and were all apparently inspired by one purpose, namely, the purpose to resist the execution of legal process."

(4) *Excluded Evidence of Defendant's Physical and Mental State, Offered to Show Lack of "Malice Aforethought."*

In every crime there must exist a union or joint operation of act and intent. (Pen. Code, § 20.) In the present case there is little dispute as to the act done by defendant; the crucial factual question is whether such act was done with the intent or motive which is an essential element of the crime denounced by section 4500 of the Penal Code; i. e., "with malice aforethought."

This issue, then, necessarily involves proof of a mental state (the specific intent or motive amounting to malice aforethought) and, as pertinent and material to resolving such issue, the prosecution (as has been shown hereinabove) was properly allowed to introduce evidence of various objective manifestations by defendant from which it could be inferred that he bore such "malice aforethought" toward prison

guards as a class and toward Brown in particular.[4]  Defendant was likewise properly allowed to give testimony as to his state of mind which tended to show lack of "malice aforethought."[5]  But defendant was not allowed to introduce proffered evidence of physicians who had observed objective manifestations by defendant from which it could be inferred that, because he was suffering from an abnormal physical and mental condition (not insanity) at the time he injured Brown, defendant acted, not with "malice aforethought," but, as he himself testified, under fear for his personal safety and in the honest belief that he was defending himself from attack by Officers Robinson and Hogan.  Defendant made and the trial court refused the following offer of proof: Two days before the assault upon Guard Brown the chief medical officer of the prison, making his customary rounds, saw defendant and was impressed by defendant's apparently abnormal state; he required defendant to report to the prison hospital where he examined defendant and caused defendant to be examined by the consulting psychiatrist of the prison; both physicians concluded that defendant was suffering from a "state of tension"; i. e., a condition in which "the whole body and mind are in a state of high sensitivity to external stimuli, and the result of this state is to cause the victim or patient to react abnormally to situations and external stimuli.  *One of the characteristics of this state is that the patient possesses an abnormal fear for his personal safety and that an external stimulus apparently threatening that personal safety will*

---

[4]In addition to the above summarized evidence of other instances of misconduct, the prosecution introduced the following evidence tending to show "malice aforethought": Testimony of a prisoner (contradicted by defendant) that on the night before the assault defendant said, "I will demand that son-of-a-bitch [Brown] be in the Warden's office [at the time of the disciplinary hearing] and I will hit him with the first thing I can get my hands on"; testimony of prison officials as to defendant's conduct, as evidencing his state of mind, immediately before the disciplinary hearing (defendant said, when he was told that he should enter the hearing room, "You'll be sorry you took me first"), at the hearing (defendant "became very noisy and upset"), and immediately after he left the hearing room and before he injured Brown (defendant was weeping and "trembling all over").

[5] Defendant testified as to his feelings toward prison officers in general and Brown in particular; as to his state of mind at the time he picked up and threw the cuspidor; and as to the attitude engendered when he learned (in 1946) that, after his 1944 conviction, the deputy district attorney who prosecuted that case (and the present case) recommended to the Adult Authority that it "not fix a definite term in this case. As long as you fail to do so, his maximum sentence will remain at life, and he will be subject to prosecution under the statute which makes it a capital offense for a life term prisoner to commit an assault."

*cause the patient to react to it more violently and more unpredictably than the same stimulus applied to a normal person. In other words, that the threshold of the fear of the patient is lower to the extent where stimuli which would normally not cause fear in the patient will cause fear in the patient suffering from this state."* (Italics added.) The psychiatrist, pursuant to the results of his examination, "made to the prison authorities certain recommendations for the alleviation of this condition; [before these recommendations were acted upon defendant injured Brown]; . . . also he examined the defendant after the occurrence out of which this charge arose and is prepared to testify to his then mental and physical condition."

The proffered evidence above summarized would be incompetent to establish the defense known as "self-defense" because one's rights in self-defense are limited to such acts as are either *actually* reasonably necessary or which would appear to a *reasonable* person, under the same circumstances, to be reasonably necessary. (*Fraguglia* v. *Sala* (1936), 17 Cal.App.2d 738, 744 [62 P.2d 783]; *Vaughn* v. *Jonas* (1948), 31 Cal.2d 586, 599 [191 P.2d 432].) But here the evidence was not offered to prove self-defense; it was offered solely in relation to the specific mental state which was necessarily put in issue by the charge and the not guilty plea and concerning which the prosecution had already produced substantial evidence. Under the circumstances the materiality of this evidence in defendant's case is patent. If he acted only under the influence of fear of bodily harm, in the belief, honest though unreasonable, that he was defending himself from such harm by the use of a necessary amount of force, then defendant, although he would not be guiltless of crime, would not have committed that particular aggravated offense with which he is charged, for the essential element of "malice aforethought" would be lacking. In resolving this question in a close case the jury could well be materially aided by the knowledge that, in the opinion of qualified experts, the defendant's condition was such that he might readily have acted from genuine fear rather than from a desire for vengeance or from any other malicious purpose.

The People seek to support the exclusionary ruling on the ground that under sections 1016, 1020, and 1026 of the Penal Code, and various decisions of this court (see, e. g., *People* v. *Troche* (1928), 206 Cal. 35, 47 [273 P. 767]; *People* v. *Coleman* (1942), 20 Cal.2d 399, 405-406 [126 P.2d 349],

and cases there cited), a defendant on trial under the general plea of not guilty is conclusively presumed to be sane and evidence to show "lack of capacity" to commit the crime charged, or any degree thereof, is inadmissible. This proposition, insofar as a showing of lack of capacity *because of legal insanity* is concerned, appears to be exactly what is contemplated by the legislation cited, but to construe and apply such legislation as permitting the prosecution to adduce evidence to prove a specific mental state essential to the crime and at the same time precluding the defendant from adducing otherwise competent and material evidence to disprove such particular mental state, short of evidence of legal insanity (which can be heard on the trial of that issue), would, we think, constitute an invalid interference with the trial process. ██ A defendant charged with a crime is presumed to be innocent of, and is entitled to appear and defend against, the charge in its entirety, not merely as to *some* of its elements but as to *each and all* of those elements. ██ Subject to various limitations a statute may validly declare a prima facie presumption to be the legal result of the proof of certain facts, but the due process clause of the Fourteenth Amendment requires that there be a rational connection between the facts proved and the fact presumed. (*Tot* v. *United States* (1943), 319 U.S. 463, 467 [63 S.Ct. 1241, 87 L.Ed. 1519]; see *People* v. *Murguia* (1936), 6 Cal.2d 190, 193 [57 P.2d 115]; *People* v. *Scott* (1944), 24 Cal.2d 774, 779 [151 P.2d 517].) To make a presumption of a factual element of guilt conclusive at *all* stages of the trial, or to preclude the defendant absolutely and at all stages from meeting proof of an element of guilt adduced by the prosecution, cannot be sustained. The interpretation and application of language in certain cases hereinafter more particularly referred to, as supporting a contrary view, must be disapproved.

(5) *Admissibility of Evidence to Show or Disprove a Specific Mental State on the Trial Under a Not Guilty Plea*

The following discussion is to be understood as having reference only to those classes of crimes which require proof of a specific mental state, as, for example, the homicides, wherein, if a charge of murder in either degree is to be supported, there must be proof of malice aforethought; lacking proof of malice aforethought the homicide can be no higher offense than manslaughter. Likewise, by way of further examples, a charge of violation of section 4500 of the Penal Code (this

case), requires proof that the assault was committed with malice aforethought; otherwise the assault (battery) would be of lower grade and would not carry the death penalty. Murder of the first degree (other than expressly first degree by statute) necessitates proof of "deliberation and premeditation" *in addition* to malice aforethought. Burglary requires proof of entry with the specific "intent to commit grand or petit larceny or any felony" (Pen. Code, § 459). Thus it is obvious that evidence to prove or disprove the existence of a particular mental state must, in the ordinary course of regular trial procedure, be received in many cases.

Disregarding for the moment the effect of sections 1016, 1020 and 1026 of the Penal Code, it is fundamental that at the trial upon a not guilty plea evidence, competent in character, which tends to show that a defendant, at the time he committed the overt act, either possessed or did not possess the specific essential mental state (as of malice aforethought, deliberate intent, etc.) is admissible. But those code sections, by providing for a bifurcated trial, in effect qualify this fundamental rule. The extent to which they qualify it appears from the following discussion:

Section 1016 enumerates the five kinds of pleas which may be entered; they include "not guilty" and "not guilty by reason of insanity." The section then declares, "A defendant who does not plead not guilty by reason of insanity shall be conclusively presumed to have been sane at the time of the commission of the offense charged . . . A defendant who pleads not guilty by reason of insanity, without also pleading not guilty thereby admits the commission of the offense [the overt act] charged." Section 1026 provides that "When a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, he shall first be tried as if he had entered such other plea or pleas only, and in such trial he shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed. If the jury shall find the defendant guilty, or if the defendant plead only not guilty by reason of insanity, then the question whether the defendant was sane or insane at the time the offense [the overt act] was committed shall be promptly tried, either before the same jury or before a new jury in the discretion of the court."

The words "the overt act" have been inserted in brackets in the above quotations of sections 1016 and 1026 to make their meaning clear. That such indicated meaning is the true

meaning of the enactments is apparent from the fact that section 1017 in prescribing the forms of the several pleas provides that the insanity plea shall be in ''substantially the following form . . .: . . . 'The defendant pleads that he is not guilty of the offense charged because he was insane at the time that he is alleged to have committed the unlawful act.' '' Furthermore, section 26 (Pen. Code) provides that ''All persons are capable of committing crimes except those belonging to the following classes:

''One. Children under the age of fourteen, in the absence of clear proof that at the time of committing the act charged against them, they knew of its wrongfulness.

''Two. Idiots.

''Three. Lunatics and insane persons.

''Four. Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent.

''Five. Persons who committed the act charged without being conscious thereof.

''Six. Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence.

''Seven. Married women (except for felonies) acting under the threats, command, or coercion of their husbands.

''Eight. Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused.''

Section 26, above quoted, is of double importance in our consideration of the problem before us because it establishes two things: 1. That an insane person is not capable of committing crime; 2. That there are several states of mind, other than insanity, which render a person incapable of committing crime.

Bearing in mind that there are, therefore, several states of mind, other than insanity, which render a person incapable of crime in the commission of an overt act while in such mental state, it is to be observed that the code sections providing for the bifurcated trial relate exclusively to the defense of not guilty by reason of insanity. That is to say, the conclusive presumption of sanity is a conclusive presumption of *sanity*; it is *not* a conclusive presumption of *legal capacity to commit crime*. (For example, the declared pre-

sumption of sanity is not a presumption that a one (or a 13) year-old child, who might pull the trigger of a cocked automatic and kill some person, had the legal capacity to commit murder or any crime.) Hence, on the stage of the trial arising from a not guilty plea it must be permissible to show that for any of the code enumerated reasons other than insanity a defendant was not capable of the crime charged. Such showing must be permissible under the not guilty plea; otherwise it would be barred altogether because, by the very nature of the defense of legal insanity, evidence other than such as is relevant and material to showing full legal insanity is not admissible in the second (insanity) section of the trial, and, if it were received, would avail the defendant nothing. Of course, evidence of the circumstances of the homicide can be admitted for what bearing it may have on the issue of sanity (*People* v. *Kimball* (1936), 5 Cal.2d 608, 610 [55 P.2d 483]) but it is only in respect to its bearing on that one issue that it is pertinent. And under our law, it is to be emphasized, insanity, as such, is either a complete defense or it is no defense at all. (*People* v. *French* (1939), 12 Cal.2d 720, 736 [87 P.2d 1014]; *People* v. *Cordova* (1939), 14 Cal.2d 308, 311 [94 P.2d 40].) It seems quite indisputable that evidence, relevant and material to proving lack of criminal capacity other than legal insanity (such, for example, as that the defendant at the time the overt act was committed was under the age of 14 and did not know the act was wrongful; or that the defendant committed the act while sleepwalking and unconscious or while under the coercion of another), must be admitted at the first (not guilty) stage of the trial, or not at all.

It is to be remembered that in the eyes of the law there is still only one trial (*People* v. *Troche* (1928), *supra,* 206 Cal. 35, 48; *People* v. *Leong Fook* (1928), 206 Cal 64, 70, 73, 77 [273 P. 779]; *People* v. *Marshall* (1930), 209 Cal. 540, 547 [289 P. 629]) but the trial is broken up into two sections or stages if insanity is pleaded as a defense. Upon the first stage the issues raised by the general plea of not guilty are tried; as a second stage, if the verdict is guilty on the first, the issues are purely those of legal insanity. The plea of not guilty by reason of insanity, it has been said, is one of confession and avoidance. (*People* v. *Troche* (1928), *supra,* 206 Cal. 35, 44; *People* v. *Leong Fook* (1928), *supra,* 206 Cal. 64; *People* v. *French* (1939), *supra,* 12 Cal.2d 720, 739.)

Commission of the overt act is conceded but criminal guilt (the mental capacity to commit a criminal act) is denied *upon*

*the sole ground* that at the time the overt act was committed the defendant was suffering such "a defect of reason, from disease of the mind . . . as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know he was doing what was wrong." (7 Cal.Jur. § 21, p. 862; *People* v. *Troche* (1928), *supra*, 206 Cal. 35, 46.)

By section 1026, on the first stage of the trial the defendant "shall be conclusively presumed to have been sane at the time the offense [overt act] is alleged to have been committed," but, by section 1020, "All matters of fact tending to establish a defense other than [former conviction or acquittal, once in jeopardy, or not guilty by reason of insanity] . . . may be given in evidence under the plea of not guilty."

It thus appears that on the trial in its first stage, mental capacity to commit the crime, insofar as sanity, but sanity only, is concerned, is conclusively presumed but that the specific mental state (intent or motive) necessary to be proved as a fact in order to establish guilt of the particular crime is not presumed, either conclusively or otherwise.

Whenever a particular mental state, such as a specific intent, is by statute made an essential element of a crime, that specific state must be proved like any other fact. (*People* v. *Watson* (1899), 125 Cal. 342, 343 [57 P. 1071]; *People* v. *Richardson* (1911), 161 Cal. 552, 558-559 [120 P.20]; *People* v. *Fewkes* (1931), 214 Cal. 142, 148 [4 P.2d 538]; *People* v. *Kirk* (1928), 94 Cal.App. 378, 381 [271 P. 347].) Since, however, the mental capacity to commit the crime—insofar as legal sanity is concerned—is conclusively presumed at the first section of the trial, it follows that the fundamental or general rule hereinabove stated must be deemed to be qualified to this extent: That evidence tending to show lack of mental capacity to commit the crime because of legal insanity is barred at that stage. This simply means that legal sanity is not in issue at the first stage of the trial and that the evidence must be confined to that which is pertinent to issues then being litigated. The issues then being litigated, if the crime is one of the types under discussion, necessarily include the question of the existence or nonexistence of the specific mental state essential to the crime charged.

The fundamental rule above stated, with its qualification, is, therefore, as follows: As a general rule, on the not guilty plea, evidence, otherwise competent, tending to show that the defendant, who at this stage is conclusively presumed sane, either *did* or *did not*, in committing the overt act, possess

the specific essential mental state, is admissible, but evidence tending to show legal sanity or legal insanity is not admissible. Thus, if the proffered evidence tends to show not merely that he *did* or *did not*, but rather that because of legal insanity he *could* not, entertain the specific intent or other essential mental state, then that evidence is inadmissible under the not guilty plea and is admissible only on the trial on the plea of not guilty by reason of insanity. The standard by which the trial judge must appraise the admissibility of evidence in every case is, of course, the familiar "right or wrong" standard hereinabove quoted, by which legal insanity as a defense is gauged. Evidence which tends to show legal insanity (likewise, sanity) is not admissible at the first stage of the trial because it is not pertinent to any issue then being litigated; but competent evidence, other than proof of sanity or insanity, which tends to show that a (then presumed) legally sane defendant either did or did not in fact possess the required specific intent or motive is admissible.

The rule as above enunciated preserves the full effect of the statute as enacted and guards against construction or application of it in such manner as might breach the requirements of due process. To go beyond such rule in excluding evidence would not preserve and enforce the statute but, rather, would extend it beyond its own terms and might transcend constitutional limits. Let us emphasize: The statute (as to the first phase of the trial) conclusively presumes the defendant to be sane; i.e., to be *capable* of guilt insofar as sanity is concerned; it does not, conclusively or otherwise, presume any *factual* element of guilt; it does not even declare any presumption of criminal capacity other than legal sanity. ▮ Legal sanity, in a criminal case, under our court declared law, means "reasoning capacity sufficient to distinguish between right and wrong as to the particular act he is doing, knowledge and consciousness that what he is doing is wrong and criminal and will subject him to punishment." (*People* v. *Sloper* (1926), 198 Cal. 238, 245 [244 P. 362], and cases there cited.) Thus, the statutory conclusive presumption of sanity is only that defendant's mental condition was such that he was able to know the nature of his act and appreciate that it was wrongful and could subject him to punishment; there is no presumption that the defendant *did* in fact have any specific state of mind (intent or motive) essential to comprise, together with the wrongful act, a particular kind or degree of crime.

It has been urged in this court that, in effect, the provisions for the two-stage trial should be completely overthrown insofar as the exclusion of evidence of insanity at the first stage is concerned. It is argued that "there can be no limitation placed upon evidence admissible as tending to prove that a defendant, because of mental instability or incapacity, did not have the intent, premeditation, deliberation or malice which is an essential element of the particular crime charged against him. Otherwise stated, if such evidence is admissible, it necessarily follows that proof of a mental condition amounting to legal insanity also would be admissible. If the defendant was insane, he did not have the particular motive which the law requires, and he would be entitled to a verdict of not guilty upon the trial of the issue raised by his plea of not guilty . . . Necessarily, that rule would allow the same evidence to be admitted upon the plea of not guilty as upon the plea of not guilty by reason of insanity . . ." For reasons hereinafter expounded we are not persuaded that the quoted proposition is sound.

In support of such proposition it is argued that "The legislative purpose, as expressed in the amendments [Pen. Code, §§ 1016, 1020 and 1026] was to simplify the *issues* before the jury, and not to restrict the admission of evidence relevant to those issues." It may be conceded at once, that the last quoted sentence is substantially true: "The legislative purpose . . . was to simplify the *issues* before the jury, and not to restrict the admission of evidence relevant to those issues." But in order to "simplify the issues before the jury" the Legislature removed entirely from the first stage of the trial any issue as to legal sanity. Hence, if the Legislature had power to provide for such separation of issues, it would follow as of course that the only evidence admissible at the first stage would be evidence relevant to issues then being tried. We think that the Legislature did have the power to separate the trial into two stages and to exclude from the first stage any issue as to legal sanity. As pointed out by Justice Shenk, speaking for the court in *People* v. *Coleman* (1942), 20 Cal. 2d 399, 406-407 [126 P.2d 349], "They [the enactments in question] were declared to be valid in 1928 in the case of *People* v. *Troche,* 206 Cal. 35 [273 P. 767], and have been upheld in a line of unvarying decisions . . . some of which are the following: *People* v. *Leong Fook,* 206 Cal. 64 [273 P. 779]; *People* v. *Valenzuela,* 7 Cal.2d 650 [62 P.2d 142]; *People* v. *Boggs,* 12 Cal.2d 27 [82 P.2d 368]; *People* v.

*French,* 12 Cal.2d 720 [87 P.2d 1014]; *People* v. *D'Angelo,* 13 Cal.2d 203 [88 P.2d 708]; *People* v. *Cordova,* 14 Cal.2d 308 [94 P.2d 40]; *People* v. *Smith,* 14 Cal.2d 541 [95 P.2d 453] . . . [p. 407].

"In *People* v. *French, supra* [12 Cal.2d 720 (87 P.2d 1014)], this court quoted with approval the general rule 'that insanity . . . is either a complete defense or none at all, and . . . there is no degree of insanity sufficient to acquit of murder but not of manslaughter.' It was said: 'The insanity of a defendant cannot be used for the purpose of reducing his crime from murder in the first degree to murder in the second degree. If responsible at all in this respect, he is responsible in the same degree as a sane man, and if he is not responsible at all he is entitled to an acquittal on both degrees.' Obviously an insane person accused of a crime would be inhumanely dealt with if his insanity were considered merely to reduce the degree of his crime or the punishment therefor. In the Troche case it was also pointed out that whether the issue of guilt or the issue of insanity should be tried first was a matter to be determined by the Legislature in the absence of any constitutional prohibition."

The force which otherwise would attach to the above quoted argument that, "If the defendant was insane, he did not have the particular motive which the law requires, and he would be entitled to a verdict of not guilty upon the trial of the issue raised by his plea of not guilty," is fully obviated by the provisions for trial on the issue of not guilty by reason of insanity. We are satisfied that the enactments in question, interpreted and applied in accord with the views herein expressed, are a valid exercise of legislative power and that the evidence to be received at the first stage of the trial is properly limited to the extent of excluding evidence tending to show either sanity or insanity.

The French case, the Coleman case, and others, rely strongly on and quote from *People* v. *Troche* (1928), *supra,* 206 Cal. 35. In the Troche case (pp. 46-47) it is declared that "The trial court committed no error in strictly following the letter of the statute (Pen. Code, secs. 1020 and 1026) and excluding, on the trial of the general issue of not guilty, all evidence tending to show the mental condition of the defendant at the time of the commission of the offense. [This sentence must be read in its context; it cannot mean that all evidence tending to prove the mental state of the defendant as possessing or not

possessing malice aforethought, deliberation and premeditation, was excluded; unless each of those factual elements of a mental state was proved the crime could not have been murder of the first degree.] The doctrine of 'partial insanity,' announced by some authorities, particularly Wharton in his work on Criminal Law, has never been recognized as the law in this jurisdiction. In this state, in order that 'insanity may be available as a defense to a crime charged, it must appear that the defendant, when the act was committed, was so deranged and diseased mentally that he was not conscious of the wrongful nature of the act committed. If he has reasoning capacity sufficient to distinguish between right and wrong, as to the particular act he is doing, knowledge and consciousness that what he is doing is wrong and criminal and will subject him to punishment, he must be held responsible for his conduct. Although he may be laboring under partial insanity, as, for instance, suffering from some insane delusion or hallucination—still, if he understands the nature and character of his action and the consequences—if he has knowledge that it is wrong and criminal, and that if he does the act he will do wrong, such partial insanity or the existence of such delusion or hallucination is not sufficient to relieve him from responsibility for his criminal acts.' [Citations.] In this state 'so far as accountability to the law is concerned, there is no middle ground.' (*People* v. *Perry*, 195 Cal. 623, 639 [234 P. 890, 896].) Such is the law in many jurisdictions. [Citations.] 'Protection is always afforded in courts of law to persons of unsound mind. Distinction is made between sanity and insanity in people, but not as respects their grade of intelligence. The law does not attempt to measure degrees of intellect, nor to make distinction with respect thereto, where the power of thought and reason exists.' [Citation.] In 14 R.C.L., page 599, section 54, it is said: 'It is the general rule that insanity, when interposed as a defense in a criminal prosecution, is either a complete defense or none at all, and it has been held that there is no degree of insanity sufficient to acquit of murder but not of manslaughter.' ''

The above quotation, taken in its entirety, is a thoroughly correct statement of the rule there under discussion, but it is not to be interpreted as meaning that evidence, not amounting to proof of legal insanity, and which is otherwise competent, tending to either prove or to disprove a specific mental state which is an essential element of a crime, cannot be received on the trial of the not guilty plea. By bifurcating the

trial the Legislature is not to be presumed to have intended to deny to a defendant the presumption of innocence, or the right to produce competent evidence to prove—or to raise a reasonable doubt concerning—his innocence, as to any element of guilt, or to have deleted any element of due process. The Legislature, by the enactments in question, *has* separated the stages of the trial on the pleas of not guilty and not guilty by reason of insanity but *it has not changed the elements of guilt of any crime nor altered the presumption of innocence.* The defendant is still presumed to be innocent at all stages of the trial of all factual elements of guilt, notwithstanding the conclusive presumption, at the first stage, that he is sane.

As stated in Troche (at p. 44 of 206 Cal.), "The requirement under the present system, that the two issues be separately tried, while a departure from the old method of procedure, *is but a departure in procedure. Each issue must still be tried* by a jury of twelve impartial persons, and the verdict must be unanimous. In substance, the old and the new systems are alike. *The guaranteed right of a trial by jury is as inviolate and just as much secured to all under the new system as it was under the old.*" (Italics added.) This declaration of the fundamental principle and construction of the law is eminently sound and is reaffirmed. Likewise the discussions in Troche, French and Coleman as to the nature of insanity as a defense are eminently correct and are reaffirmed. But, in order that there may exist no area for doubt, based on isolated language in any of those decisions or in the cases therein cited, relative to the admissibility of evidence otherwise competent and material, to prove or to disprove the possession by a defendant of a specific mental state (other than sanity or insanity), which must be proved as an essential factual element of the particular crime charged, we expressly declare that insofar as any language in the Troche, French or Coleman cases, or in the cases cited therein, may be deemed inconsistent with the fundamental principle quoted above from Troche, or with the views expressed herein, such inconsistent language must be regarded as disapproved.

The enactments under discussion are themselves simple in language; so too is the exclusionary rule we have stated, which but follows the enactments precisely and neither enlarges nor diminishes the import of the legislative language. The difficulties which both trial judges and reviewing courts have experienced in applying the law appear to have arisen principally from an understandable tendency of prosecutors

to seek to enlarge the operation of the exclusionary feature to preclude at the trial of the general issue not only evidence of insanity but also evidence, short of legal insanity, material to the issue of some specific mental state essential to the crime charged. This effort should not be countenanced. It must be borne in mind that insanity as a defense is one thing and that proof of the existence or nonexistence of the specific essential mental state, disjoined from any question of legal sanity, is quite another thing. The enactments are to be applied as written and neither extended nor curtailed.

Triers of fact are often required, as were the jury in this case, to ascertain whether a nonobjective fact, a certain intent or state of mind, existed. In a prosecution for felonious homicide a trier of fact may have to determine whether the accused had that state of mind which would make the killing justifiable in self-defense—whether he acted only under the influence of honest, reasonable fear (Pen. Code, § 198); whether he acted in the heat of passion resulting from provocation which would naturally arouse the passions of the ordinary, reasonable man (Pen. Code, § 192; *People* v. *Valentine* (1946), 28 Cal.2d 121, 137-139 [169 P.2d 1]), in which case the offense is manslaughter; whether "the circumstances attending the killing show an abandoned and malignant heart" (Pen. Code, § 188), and not a more severely condemned criminal intent or state of mind, in which case the offense is a type of second degree murder; whether the killer has not only acted with "malice aforethought" but also formed and carried out a deliberate, premeditated intention to kill (Pen. Code, § 189; *People* v. *Thomas* (1945), *supra*, 25 Cal.2d 880, 900), in which case the offense is a type of first degree murder. Burglary requires proof of entry with specific "intent to commit grand or petit larceny or any felony" (Pen. Code, § 459). In each of such cases the intention is manifested by, and found by the trier of fact from, "the circumstances connected with the offense" (Pen. Code, § 21). And in each case where such intention must be determined the trier of fact should have the advantage of being informed as completely as possible of such circumstances, in aid of appraisement of the ultimate, nonobjective fact.

Here, the offer was to show not insanity, not a lack of mental capacity to have malice aforethought, but, rather, the fact of nervous tension and that the particular tension was directly relevant to the issue of "purpose, motive, or intent"; i.e., to the critical question as to whether defendant's

overt act was done with "malice aforethought" or was actuated by fear, genuine although unfounded in ultimate truth. This evidence was admissible for reasons similar to those which fundamentally make evidence of intoxication admissible. Although we have a statute (Pen. Code, § 22) which expressly covers evidence of intoxication, we think that the statute in providing for the admissibility of such evidence in certain circumstances is but declaratory of what would be the rule were there no statute on the subject. "[W]henever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act." (Pen. Code, § 22.) This specific statutory provision that the fact of intoxication may be shown relative to the proof of a state of mind appears to have been prompted by the fact that it is preceded, in the same section, by the declaration that "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition." Thus the Legislature was at pains to insure that the enactment of the last quoted (but in code section 22, first stated) rule, should not affect the general rule as to admissibility of evidence and necessity for proof relative to an essential specific state of mind. The fact that the accused was intoxicated can be proved both by testimony of the accused himself as to his condition and by testimony of competent observers as to their opinion of his condition. Likewise, the fact that the defendant here was in a state of nervous tension and subject to abnormal fears from slight stimuli can be proved by both such types of testimony. Defendant should not have been limited to describing his own condition, testifying to his own purpose and belief, and denying that he acted with the purpose which the prosecution evidence tended to show. He should have been allowed, as was the prosecution, to present the testimony of persons who had observed behavior of defendant bearing on the ultimate fact of "malice aforethought."

The issue upon which the improperly excluded evidence was offered does not, however, appear to have been a close one. In accord with the mandate of section 4½ of article VI of the state Constitution we have examined the entire cause, including the evidence, and have concluded that the rejection of the physicians' proffered testimonies did not result

in a miscarriage of justice. Able and conscientious counsel have not on behalf of defendant pointed out, nor have we discovered, any reason for the jury's having been in doubt or difficulty in resolving against defendant the question of his state of mind. It is apparent from defendant's own frank testimony[6] that he set up for himself and for the prison officials standards of conduct different from those recognized by the law of this state and the rules of the prison, and that, fully aware of the probable consequences, he conducted himself in accord with such standards rather than according to law. The jury determined—and it is almost impossible to imagine that either with or without the proffered, excluded testimonies they could have determined otherwise—that defendant at the time of the charged offense was acting pursuant to such just mentioned personal standards, and malice for those who breached them, rather than under the influence of honest, mistaken fear.

For the reasons above stated the judgment and order appealed from are affirmed.

Gibson, C. J., Shenk, J., and Spence, J., concurred.

EDMONDS, J.—For the reasons stated in my dissenting opinion in *People* v. *Danielly, post,* p. 362 [202 P.2d 18], I agree that the testimony of the prison physicians who had Wells under observation just prior to the time of the commission of the acts with which he was charged, was improperly excluded. Evidence tending to prove that a defendant did not have the state of mind which the statute requires as an essential element of a crime should always be admissible upon a

---

[6] "Q. [Referring to the night before Brown was injured, when defendant violated a prison rule by creating a disturbance]. You made sufficient noise to awaken every one in that immediate vicinity? . . . A. I would say yes. Q. In other words, you at that time were not concerned with awaking people, although you had been making all this fuss when you had been awakened when the officer was doing his duty in counting the cells? A. I am interested in looking out for Wells' welfare. I was due to appear before the court the next morning for disciplinary action, and I wanted to be able to present some kind of a case . . . I rattled my cup on the door, which is proper to do if you want to speak to the guard. The guard came up and I made my request and he said he would make his report, and I told him that I must see Lieutenant Stevenson . . . I said, 'I will give him about twenty minutes. I don't want to create any disturbance to cause anybody any trouble, but I want to see him this morning, because I am going to court.' Q. In other words, you were laying down an ultimatum? A. If you want to put it that way . . . I was going to continue to make a noise until I saw Lieutenant Stevenson . . . Any time I feel I am being misused by an officer or by anyone I resent it, and I will let them know I resent it, and if they haven't given occasion to show any different use toward me, I conduct myself as a gentleman."

plea of not guilty as a defense to the charge. The refusal to admit such evidence allows one to be convicted of the crime defined by section 4500 of the Penal Code without proof of the requisite mental intent specified by the statute and constitutes a denial of due process of law.

As in the case of premeditation and deliberation necessary to establish murder of the first degree (see dissent in *People* v. *Danielly, post,* p. 362 [202 P.2d 18]) the nature of the inquiry into "malice aforethought" calls for the application of a subjective test. When a statute requires a particular intent as an essential element of a crime, the inquiry may include, among other factors, evidence bearing upon the capacity of the mind of the accused. The restriction of the inquiry to the test of the actions of a "reasonable man" subverts the very purpose of the requirement of the specific criminal intent.

The considerations which govern an appellate court in passing upon the prejudicial effect of an erroneous exclusion of evidence are somewhat different from those which apply when evidence is improperly admitted. Clearly, the prejudicial effect of error committed by the exclusion of evidence can be cured where other evidence has been admitted to prove the fact or condition sought to be established (*Siebel* v. *Shapiro,* 58 Cal.App.2d 509 [137 P.2d 56]; *Ash* v. *Soo Sing Lung,* 177 Cal. 356 [170 P. 843]) or where the challenged testimony was later admitted without objection (*Callahan* v. *Marshall,* 163 Cal. 552 [126 P. 358]; *Robertson* v. *Bonelli,* 65 Cal.App.2d 704 [151 P.2d 307]), for, under such circumstances, the question concerns only the effect of the exclusion of evidence additional to that otherwise presented. But where the court, as here, bars a defendant from introducing any medical evidence whatever tending to show either his state of mind or capacity to act maliciously for the purpose of disproving the existence of an element of the crime specified by the statute, the ruling necessarily constitutes a miscarriage of justice within the meaning of section 4½ of article VI of the Constitution.

I would reverse the judgment and the order denying a new trial.

Traynor, J., concurred.

CARTER, J.—I dissent.

I agree with the holding in the majority opinion that the

proffered evidence of defendant's mental condition was admissible and that it was error to exclude it. I cannot, however, assent to the limitation placed upon evidence of that character to that which falls short of establishing legal insanity, nor to the holding that the exclusion of the evidence was not prejudicial error.

Turning first to the limitation placed upon evidence of the mental condition of the defendant bearing upon the presence or absence of specific intent, malice, premeditation and the like, it is my understanding that the majority opinion holds that if the evidence offered shows a mental condition amounting to total insanity or legal insanity—the inability to distinguish between right and wrong, then it is not admissible at the trial of the issue raised by the plea of not guilty. For illustration, it is said: "Thus, if the proffered evidence tends to show not merely that he *did* or *did not*, but rather that because of legal insanity he *could* not, entertain the specific intent or other essential mental state, then that evidence is inadmissible under the not guilty plea and is admissible only on the trial on the plea of not guilty by reason of insanity." In my opinion that rule is unsound, wholly impractical to apply and will lead not only to absurd results but will tend to encourage perjury and the juggling of words by expert witnesses on the question of defendant's mental condition. It is unsound because it violates the fundamental principle that "the greater contains the less." (Civ. Code, § 3536.) If the accused's mentality at the time of the commission of the unlawful act was such that he could not distinguish between right and wrong—had no reasoning capacity at all, he could not have had a specific intent, premeditated or acted maliciously. Thus evidence of that condition would establish a total lack of intent, premeditation or malice— elements, the proof of which, is indispensable to establish guilt. It is strange reasoning to say that you may prove a partial mental quirk or disability to refute the presence of intent but cannot give evidence of a total mental aberration. That is equivalent to saying that blindness in one eye will absolve a person from guilt, but that two sightless eyes will constitute no defense. Is this not a paradoxical absurdity?

The impracticability of the application of the rule is manifest. I have no doubt that trial judges, counsel and expert witnesses will be completely bewildered when they endeavor, each in his sphere, to apply the rule—to attempt to present and give evidence in a trial under the plea of not guilty. It is to

be noted from the foregoing quotation from the majority opinion that it is not only evidence of insanity that is not admissible but also any evidence *tending* to show that condition is likewise barred. Thus any evidence that might show a symptom of insanity could not be given. In the instant case it may be that defendant's condition—"a state of tension"—is an indication of insanity. I do not know whether it is or not. I am not a psychiatrist. I doubt if counsel or the trial judge will find themselves in any better position. Suppose defendant's expert witness testifies on direct examination that defendant's condition was such that he could not pursue one thought for any period of time beyond a second. Clearly that testimony would be admissible to prove lack of premeditation, deliberation or malice. If, on cross-examination by the prosecution, the witness states that defendant is insane—cannot distinguish between right and wrong, should a motion to strike his testimony in chief be granted on the ground that the evidence showed a mind too far deranged to form an intent or to premeditate or deliberate? Under the theory of the majority the motion should be granted. Suppose that evidence of a mental condition which concededly would be admissible under that theory was adduced by defendant but the prosecution produced evidence that such condition undoubtedly established defendant as hopelessly insane. Would defendant's evidence be stricken or would the jury be instructed that they could not consider it if they found that defendant was insane? But they could not find him insane because, in the not guilty stage of the trial, defendant is presumed to be sane. Surely the jury would be justified in saying to themselves: "What strange things these judges, lawyers and laws are."

I have assumed in the foregoing discussion that the rule stated in the majority opinion could be applied. At least an endeavor would be made to apply it, but its use is so impossible that it could not be followed, thus leaving nothing of it but words. Counsel for the defense would be urgently tempted to frame their questions to defendant's expert witnesses in such a' fashion that the answers would show any mental condition short of insanity and to coach the witness to beware of pronouncing the defendant insane. Rather than putting a question and receiving an answer that the defendant could not distinguish between right and wrong, the elicited testimony would state that with his mental condition, he did not have a specific intent, nor did he premeditate or deliberate the commission of the crime, all of which would encourage

concealment and dishonesty on the part of the witness. Moreover, the trial court not being able to differentiate between evidence tending to show insanity, and that which did not go that far, would be inclined to let in any proffered testimony thus avoiding the possibility of reversal on appeal.

In my opinion there can be no doubt that the error in excluding the evidence of mental condition was prejudicial to defendant. The majority concedes that the "*crucial* factual question" was whether the act was done with malice aforethought and that "the materiality of this evidence in defendant's case is patent." The only evidence of malice was the inference that might be drawn from the conduct of defendant on other occasions. It certainly was not so overwhelming that it may be said, as does the majority, that it established malice *as a matter of law.* On the other hand the evidence offered by defendant was direct and forceful and from qualified witnesses who examined defendant at the time the offense was committed. Nothing could have been more pertinent. To say that the result would not have been different is impossible. It is equivalent to barring a defendant from offering any evidence on a defense such as insanity or self-defense, which would clearly be prejudicial.

I would, therefore, reverse the judgment and remand the case for a new trial.

Appellant's petition for a rehearing was denied February 21, 1949. Edmonds, J., Carter, J., and Traynor, J., voted for a rehearing.