[Crim. No. 6752.   In Bank.   Feb. 9, 1961.]

THE PEOPLE, Respondent, v. HAROLD JOSEPH
GOLDEN, Appellant.

Landau & Segal, Bernard I. Segal, Hertzberg, Hoffman & Geretz and Philip Deitch for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and David R. Cadwell, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant appeals from a judgment of conviction of two counts of statutory rape (Pen. Code, § 261, subd. 1) pursuant to jury verdicts which recommend punishment by imprisonment in the county jail, and from an order denying defendant's motion for new trial. He urges that the testimony of the prosecuting witness, 14 years of age at the times of the alleged offenses (April 2 and May 17, 1958), is inherently improbable and that asserted errors led to verdicts based on passion and prejudice. For reasons hereinafter stated we have reached the following conclusions: Although the testimony of the prosecuting witness as to the acts constituting the charged offenses is not incredible, her testimony as a whole indicates lack of candor. The evidence as to every phase of her relationship with defendant is in sharp conflict. The prosecution erroneously created and exploited before the jury a situation in which evidence explaining the nonproduction of a possibly important witness (defendant's stepdaughter) was misused and overemphasized. ■ In this state of

the record it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the errors hereinafter described and reversal is therefore proper. (*People* v. *Watson* (1956), 46 Cal.2d 818, 835-837 [12, 13] [299 P.2d 243] ; Cal. Const., art. VI, § 4½.)

*Testimony of the Prosecuting Witness.* The prosecuting witness, hereinafter called P, first met defendant Golden about March 28, 1958, when she had a "date" with defendant's teen-aged son A. Defendant acted as chauffeur. During the evening defendant sent A on an errand while he and P remained in his car. P testified that in A's absence defendant suggested that she become a model, said that he could help her in that profession, asked whether she had "been made love to and that sort of thing," drove into an alley, and touched her lewdly.

On the afternoon of April 1 defendant and A took P to a celebration of the birthday of Mrs. Golden. Also present was W, who was Mrs. Golden's teen-aged daughter and who lived with the Goldens. (A, defendant's son by a prior marriage, lived with his own mother.) After the group had dinner at a restaurant, P and A stayed overnight at the Golden home. P slept with W in her room and A slept in the den; between these rooms was a connecting bathroom. Across the hall was the master bedroom with a bathroom adjoining it. On direct examination P testified that on the morning of April 2 she arose while W was still asleep and went into the bathroom which was between W's room and the den. Defendant came into this bathroom, removed P's pajamas, told her to lie on the floor, and had sexual intercourse. He stopped when P told him to do so "because he hurt me." Defendant left the bathroom, P put on her pajamas and returned to W's room, and next saw defendant in an hour or so, when the entire household was up.

On cross-examination P elaborated this account as follows: When she arose on the morning of April 2 she first went to the kitchen to look for coffee. Defendant came into the kitchen and said that he would like to see P alone later. In view of her previous experience with defendant, P intended "to avoid seeing him alone." Thereafter, when she went into the bathroom, defendant came into that room. P did not remember whether defendant came from the room where his stepdaughter was sleeping or the room where his son was sleeping. After the previously mentioned sexual intercourse P sat in W's room for a time, while W remained asleep, then went through the

bathroom to the den and found A watching television. They talked briefly until he asked her to leave so that he could dress.

The second alleged statutory rape occurred on the afternoon of May 17, 1958. P testified that on that afternoon defendant drove her, her girl friend J, and some teen-aged boys to the Golden home where there was a birthday party for A. About a dozen adolescents, including defendant's stepdaughter W, attended the party. During the afternoon defendant told P to go to his car because he wished to talk with her. Defendant walked away and P "asked [J] to go with me because I was afraid of what might happen if I went alone." When defendant returned J had disappeared. P left the party with defendant in his car. He drove to an isolated hill and they had sexual intercourse. They returned to the Golden home within half an hour and the party adjourned to a restaurant. There the group sat around a piano bar and birthday cake was served.

During approximately the next 10 days defendant telephoned P at her home two or three times and asked her to meet him at designated places but when P went to those places defendant did not appear. On May 28, 1958, defendant by telephone arranged to meet P at a street corner near her home at 8 p. m. P took her friend J to the meeting place. The girls got into defendant's car. He asked them if they were interested in earning money by modeling and "work on the side." At defendant's direction they removed some of their clothes and he touched them lewdly. Thereafter the girls walked to P's home and had "some kind of trouble" (apparently adult protestations which led to this prosecution). The next day P was examined by a doctor at juvenile hall.

Prior to the night of May 28 P had said nothing of defendant's misconduct to anyone except her girl friend J. She had reported her experiences with defendant to J perhaps shortly after she met defendant on the 28th of March, perhaps on the night of the first statutory rape (April 2) or perhaps later.

*Other Witnesses who Testified as Part of the People's Case in Chief.* The doctor who examined P on May 29 found an incomplete rupture of the hymen which was healed and which was of a sort that would be expected to have healed within a week or 10 days after its occurrence.

P's girl friend J gave the following testimony: Early in April, 1958, P told her of her experiences with defendant. On the afternoon of the party of May 17 P asked J to go with her and defendant in his car because P said "She was afraid

of him.'' J looked for her purse to take with her and by the time she found it P and defendant were gone. They returned in about half an hour. P told J that ''It happened again.'' J also corroborated P's testimony as to the events of the night of May 28.

On cross-examination P and J testified that at the party of May 17 they did not observe defendant produce a $50 bill. This incident of the $50 bill, developed by the defense, is hereinafter described.

*The Defense.* Defendant testified that he did not have intercourse with or commit any improprieties against P. According to the testimony of defendant and his son A, on the night of March 28 A was absent from defendant's car for only two or three minutes (a period of time too short to accommodate the improper happenings of that night described by P).

Defendant testified that at no time after the household retired on April 1 (the night of Mrs. Golden's birthday party) or on the next morning did he go into the room of his stepdaughter W, the den where A slept, or the bathroom between those rooms. Defendant, Mrs. Golden, and A all testified to the following effect: At about 7 or 7:30 on the morning of April 2 defendant and Mrs. Golden (who were sleeping in the master bedroom) and A (who was sleeping in the den) arose. They had coffee together and defendant left the house about 8:30 a. m. P and W remained asleep in the latter's room until about 10:30 a. m.

As to the afternoon of May 17, defendant denied that he and P left A's birthday party together. He testified that as soon as he delivered P and the other young people to the Golden home, at about 3 or 3:30 p. m., he left his house for a business appointment at which Mrs. Golden joined him; he and his wife returned to the Golden home later in the afternoon; A asked for a driving lesson and, accompanied by defendant and P, drove only about half a block when they saw the arrival of cabs which had been ordered to take the party to the restaurant; A, defendant and P at once returned to the house and, with the rest of the party, proceeded to the restaurant. Mrs. Golden corroborated this testimony, and testimony of A and three other boys who were at the party tends to confirm defendant's denial that he and P left together during the afternoon of May 17.

Defendant, A and some of his friends, and a man who happened to be at the piano bar on the night of May 17 described the following incident (the occurrence of which P

denied) : Defendant produced a $50 bill to pay for the birth-day cake. Some of the young people exclaimed that they had never seen one and asked to inspect it. It was passed among them and when it was handed to P she put it down the front of her dress in a joking and flamboyant manner. The incident was more or less forgotten in the course of the evening and P did not return the bill. Thereafter defendant by telephone and A directly made several requests of P that she return the money but she did not do so.

Defendant further testified that after May 17 he did not see P until this proceeding had been instituted. During the series of telephone calls by which he asked her to return the money she first assured him that she would do so but then "changed her attitude"; "she started to tell me that what did I need $50 for, that I had plenty of money," and eventually told defendant that she and J had spent the $50. According to defendant, he then told P that unless she returned the money he would inform her guardian, with whom she lived, and if necessary the police, of her taking the money; but he testified that he did not mean these threats seriously.

*The Argument that the Testimony of the Prosecuting Witness is Inherently Improbable.* ▮▮▮ Defendant urges that the following circumstances make P's account of the offenses incredible: Although P testified that she feared what defendant might do to her, she nevertheless made it possible for them to be in the situations in which the alleged crimes occurred. She did not resist defendant's advances or make complaint of them to any adult (except perfunctorily to defendant himself). Although P testified that the first statutory rape hurt, and the physician who examined P testified that the penetration would have caused pain, P made no outcry. Her testimony is uncertain and inconsistent as to matters which would have been expected to impress themselves on her memory.

Certainly P's testimony suggests that she was far from candid. ▮▮▮ But "evidence which is unusual or inconsistent is not necessarily improbable." (*People* v. *Headlee* (1941), 18 Cal.2d 266, 267 [1] [115 P.2d 427].) ▮▮▮ And the record suggests credible explanations of P's making herself available as a victim and of apparent inconsistencies in her testimony. For example, the jury could have believed that P, as well as defendant, was interested in sexual experimentation and that P was also interested in the financial rewards of the "modeling career" which defendant suggested. They could have accepted her testimony that the statutory rapes

occurred, yet disbelieved her testimony that she was afraid of defendant and her denial of the incident of the $50 bill, and attributed the latter testimony to her desire to put a favorable explanation on her motives and behavior. Also the triers of fact might have believed that P correctly explained an aspect of her motivation when she stated, according to the testimony of her girl friend J, that she accepted defendant's sexual advances because she did not wish to offend the father of her young escort A.

*The Failure to Produce Defendant's Stepdaughter W as a Witness.* ▉ In appraising the whole record to determine whether there has been a miscarriage of justice, we must keep in mind that because of the inflammatory nature of the charges, the substantial conflicts in the evidence, and the lack of frankness (whatever its cause) of the prosecuting witness, errors which might otherwise be minor may, in the context of this case, result in grievous injustice. (See *People* v. *Burton, ante,* pp. 328, 340-341 [11 Cal.Rptr. 65, 359 P.2d 433].) As will appear, the prosecuting attorney intentionally delayed calling W as a witness although he was fully aware of the relevance of her knowledge, and then in effect "played games" as to W's disappearance during the trial. Because of the subsequently related combination of circumstances, it is probable that the jurors' attention was diverted from the basic issue of defendant's guilt and their verdicts were prejudicially influenced by such disappearance and that of defendant's wife, Mrs. Golden, matters for which, so far as appears, defendant was not responsible.

This case was tried twice before. The first trial terminated with the granting of defendant's motion for declaration of a mistrial and the second trial with the jury unable to reach a verdict. At the first two trials defendant's stepdaughter W, whose presence shortly before and after both statutory rapes is described above, was not called as a witness by either side. From colloquy outside the presence of the jury at the present trial, it appears that at the second trial defense counsel had said that he did not produce the girl's testimony because he wished to protect her from unpleasantness, and that the prosecuting attorney had presented what he felt was a telling argument to the jury that defendant did not call W because her testimony would have been unfavorable to him. With this background the situation as to producing W at the present trial developed as follows:

On the fourth day of trial (a Thursday) Mrs. Golden com-

pleted her testimony for defendant. The prosecuting attorney did not cross-examine her on the matters to which she testified on direct examination, but devoted himself to eliciting her assurance that her daughter W would be available at the Golden home for service of a subpoena by the People. The substance of the "cross-examination" is quoted in the margin.[1]

The next morning of the trial (Friday) the prosecuting attorney, out of the presence of the jury, informed the court that his process servers had been unable to locate W. The People moved for a continuance to enable them to produce her as a witness. The prosecutor said he had been told that during the trial W had been staying with an aunt rather than at the Golden home and that Mrs. Golden, after her testimony of the preceding day, had taken the girl away with the stated purpose of concealing her. Defendant, urging that the People had not been diligent to subpoena W, objected to a continuance. The trial judge concluded that W was a material witness because "There are . . . direct conflicts in the testimony which revolve around her on two occasions," and also directed that a subpoena issue for Mrs. Golden because in his opinion she "was not wholly frank in her answer on the stand yesterday. . . . The Court wants to talk with her." A continuance from Friday to Tuesday was granted.

On Tuesday neither Mrs. Golden nor W was present. Out-

---

[1] "Q. Mrs. Golden, do you have a daughter . . . who was in attendance at this party [on May 17]? A. Yes, I do. . . .

"Q. . . . [D]id she come to court with you this morning? A. No . . . She is in school. . . .

"Q. And will you tell me, please, where I can reach her for the purpose of serving a subpoena on her? . . . What is her residence address? . . . A. 3714 Cody Road [the Golden home]. . . .

"Q. I see. Well, if I send someone out there with a subpoena for [W], do you anticipate she will be there?

"MR. MAMAKOS [defense counsel]: Your Honor . . . I am going to object as to what this witness anticipates or not. I think it's immaterial.

"MR. FAGAN [prosecuting attorney]: We are just trying to locate the witness, Your Honor. That is all.

"MR. MAMAKOS: I am sure the District Attorney has many means at his disposal of locating any witness or all witnesses.

"THE COURT: The objection as to the form of the question is sustained. . . .

"BY MR. FAGAN: . . . Q. And to the best of your knowledge, [W] will be home this evening? A. Unless she is over at her girl friend's doing homework, but I know she will be home this evening.

"Q. You would know where to locate her, wouldn't you?

"MR. MAMAKOS: Your Honor, I am going to object again. I think the Court has already ruled on a similar question. . . .

"THE COURT: The objection is sustained as to the form of the question.

"BY MR. FAGAN: Q. Will you do your best to make her available for a subpoena at that address, 3714 Cody Road? A. I will, sir."

side the presence of the jury, the prosecuting attorney offered to prove his inability to locate W; defense counsel's objection that such evidence was immaterial and was not proper rebuttal was overruled; and the People refused defense counsel's offer to stipulate that they had been unable to subpoena W.

The People then introduced evidence that during the first days of trial W had stayed with her aunt, that the aunt had not seen W after she left for school on Thursday morning, that commencing on Friday W had been absent from school without explanation and that investigators for the district attorney had been unable to locate her or Mrs. Golden.

The prosecuting attorney in argument to the jury spoke of the disappearance of Mrs. Golden and W after Mrs. Golden had testified that the girl would be available, and said, "Was she [Mrs. Golden] telling you the truth then? And do you expect her to be telling you the truth about anything else? I suggest she was not."

The prosecutor further argued that "what the defense did not offer, I think, is the most significant part of this whole case," and said, "Do you think she [W] could have added something? Sure, she could have added something. And do you think it would be good for the defense? Why? What do you think? The girl's dropped from sight. Maybe she knows something and maybe she doesn't. We will never get a chance, will we, to find out." After defense counsel had argued that he could "conjecture" that defendant did not produce W because of the nature of the trial, the prosecuting attorney in closing argument said, "Now, when we want her, she is gone. I don't know what inference you draw from that, but my inference is that this touching solicitude that has been indicated on the part of this defendant is just an explanation but not an answer to her non-appearance in this court of law, because I think she could have added something, either for the defense or for the people." The prosecutor did not directly suggest to the jury that defendant himself was responsible for W's disappearance.

█ The prosecuting attorney's questioning of Mrs. Golden quoted *supra,* footnote 1, page 367, was not proper cross-examination. It was not designed to serve either of the purposes of such examination, which are to overcome, qualify or explain the witness's testimony on direct examination (*People* v. *Dotson* (1956), 46 Cal.2d 891, 898 [11] [299 P.2d 875]) and to test his accuracy, recollection, knowledge or credibility (*Laird* v. *T. W. Mather, Inc.* (1958), 51 Cal.2d

210, 219 [9] [331 P.2d 617]). W's whereabouts and prospective availability for subpoena at the time of the cross-examination of Mrs. Golden (in 1959), had nothing to do with the events of April and May, 1958, as to which Mrs. Golden testified in chief. ■ And although wide latitude should be allowed the cross-examiner in testing the witness's accuracy and credibility (*People* v. *Burton, ante,* p. 343; *Estate of Kasson* (1900), 127 Cal. 496, 500 [59 P. 950]) the use which the prosecutor made of Mrs. Golden's testimony concerning W's whereabouts indicates that his purpose was not such proper testing but was rather, at best, that of "trying to locate the witness [W]." ■ Although defense counsel's objections to this line of inquiry were not as prompt and specific as they should have been (*Bundy* v. *Sierra Lumber Co.* (1906), 149 Cal. 772, 776 [87 P. 622]), he did say, in reply to the just quoted avowal of the People's purpose, that "I am sure the District Attorney has many means at his disposal of locating any witness." Thus it appears that defendant's objection was not merely the superficial, general one that the inquiry was "immaterial," nor was it, as the trial judge apparently misunderstood it, only to "the form of the question"; rather, defendant in effect was complaining that the whole purpose of the line of inquiry was improper.

■ The circumstances in which the objection was made further indicate its nature and validity. The People had known for months that W had been present during the occurrence of relevant matters; they believed from the previous trial, and so advised the present trial judge, that her failure to testify was regarded by the former jury as significant; yet they waited until the fourth day of this trial, when the presentation of the defense in chief was well along, to initiate inquiry as to her availability for subpoena and they instituted this inquiry, not in normal course by sending forth process servers, but rather by questioning the prospective witness's mother before the jury. It appears obvious that the People delayed their attempt to serve W in the hope that defendant would produce her so that they could cross-examine her as a hostile witness and that, when the prosecutor decided that W's presence for the defense was not forthcoming, he undertook a "grand stand play" of which the first step was the objectionable "cross-examination" of Mrs. Golden.

When it became apparent that the whole line of inquiry was objectionable the trial judge, despite the lack of specificity

of defendant's objections, should have halted it. (See *Short* v. *Frink* (1907), 151 Cal. 83, 86 [90 P. 200].)

■ The next day of trial the prosecutor, over defense counsel's objection that the People had not been diligent to subpoena W, obtained a continuance. The trial judge's ruling was based on his stated opinion that W was a material witness and also on his stated belief that Mrs. Golden had not been frank in her testimony. The judge may have been correct in these opinions, but in view of the timing of the request for a continuance its granting was of questionable propriety. The prosecution could hardly have been surprised by defendant's failure to call W as his witness, for he had indicated at the previous trial that he wished to protect her from the strain of a court appearance. Nor was there any occasion for suspending the trial, and thus heightening the dramatic impact of the situation on the jury, for both parties had other witnesses which they apparently intended to—and which they subsequently did—produce to testify to other matters. However, we do not hold that the granting of the continuance in itself was a prejudicial abuse of discretion but rather that, combined with prior and subsequent developments, it contributed to prejudicial error which arose from the prosecutor's whole course of conduct in regard to W.

The next development, as stated, was the introduction at some length of evidence that after Mrs. Golden had testified that W would be available for subpoena Mrs. Golden and the girl disappeared. The prosecuting attorney out of the presence of the jury urged, and the People on appeal contend, that this evidence was admissible for three purposes: (1) to show defendant's consciousness of guilt, since it assertedly could be inferred that he participated in concealing W; (2) to rebut unfavorable inferences which might be drawn from the People's failure to produce W; (3) to impeach Mrs. Golden.

■ Defendant, citing *People* v. *Perez* (1959), 169 Cal. App.2d 473, 478 [4] [337 P.2d 539], correctly points out that his relationship to Mrs. Golden and W does not support an inference that he was responsible for their disappearance, and there is no other evidence to show that he was connected with it.

Had the evidence of W's disappearance been received in the normal order of proof, however, the situation would have been like that in *People* v. *Lyons* (1958), 50 Cal.2d 245, 266 [22] [324 P.2d 556], where the People were allowed to introduce evidence of their unsuccessful efforts to produce one

Gallo as a witness. His testimony (like that of W here) would have been material but cumulative, and whether it would have corroborated the evidence of the prosecution or that of the defense did not appear. Defendant Lyons argued that the evidence of the People's attempt to produce Gallo ''was presented to confuse the jury and cast suspicion on defendant by an implication that Gallo's testimony would be favorable to the prosecution.'' We held that ''Although there is no showing that it would have been favorable to the prosecution, the prosecution was entitled to explain why Gallo was not produced, to forestall any question which might arise in the minds of the jury as to why Gallo did not testify.''

Defendant relies on *People* v. *Carter* (1957), 48 Cal.2d 737, 753 [16, 17] [312 P.2d 665], to support his contention, presented by objection in the trial court, that the testimony as to W's unavailability was not proper rebuttal evidence. We said there, ''Section 1093, subdivision 4, of the Penal Code provides that after the defendant has offered his evidence, the prosecution may then offer 'rebutting testimony only, unless the court, for good reason, in furtherance of justice . . .' permits it to offer evidence upon its original case. In a sense all evidence that tends to establish the defendant's guilt over his protestations of innocence rebuts the defendant's case, but it is not all rebuttal evidence within the purpose of section 1093, subdivision 4. The purpose of the restriction in that section is to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of trial with an additional piece of crucial evidence. Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.''

The situation here is materially analogous to that condemned in the Carter case, despite their factual dissimilarity. The prosecutor in this case deliberately refrained from attempting to subpoena W until late in the trial. He emphasized the matter by his improper cross-examination of Mrs. Golden. Then, when Mrs. Golden and W disappeared, he dramatized

the situation by an array of rebuttal witnesses, and in argument to the jury he spoke of defendant's failure to call W as "the most significant part of the whole case."

Furthermore, the prosecuting attorney incorrectly argued to the jury that because Mrs. Golden did not testify truthfully as to W's prospective availability for service of subpoena, it could not be expected that she told the truth about anything else. The People are mistaken in their contention that the evidence of W's disappearance was admissible to impeach (contradict) Mrs. Golden's testimony. As defendant points out, such use of the rebuttal evidence as to W would be improper impeachment on a collateral matter. (*People* v. *Wells* (1949), 33 Cal.2d 330, 340 [7] [202 P.2d 53] ; *People* v. *Dye* (1888), 75 Cal. 108, 112 [16 P. 537].)

The prosecutor's tactics as a whole in respect to producing W smack of trickery in an attempt to get before the jury a melodramatic situation which would cause them to exaggerate the importance of W's testimony and the unreliability of Mrs. Golden and thus discount the weakness of the essential testimony of the prosecuting witness P. And even if the prosecuting attorney was making an honest but mistakenly timed effort to get at the truth in this case by tardily producing the testimony of W regardless of whether it would favor defendant or the People, the effect upon the jurors would be equally confusing and improper.

Because our reversal of the conviction on this appeal does not necessarily finally dispose of this case, and because two other matters of which defendant complains may recur, we (obedient to Code Civ. Proc., § 53) dispose of the following contentions:

*Claimed Uncertainty of the Times of the Offenses.* Defendant complains that because the prosecuting witness did not testify with certainty to the times of the statutory rapes he was deprived of the opportunity to present alibi testimony. P testified that the first offense occurred shortly after she arose on the morning of April 2 ; she did not know the time but when she got up "It was just beginning to get light." Her testimony as to the second offense places it some time on the afternoon of May 17, between the hours of "around 2 :00 or 3 :00" when she arrived at the Golden home and about 5 p. m. when the party moved to the restaurant. These approximate times gave defendant as much opportunity to present any available alibi evidence as if she had testified that the crimes occurred at certain moments, and defendant's disbelieved alibis in fact did amply cover the approximate times to which P testified.

*Asserted Impropriety of Permitting the Witness S to Consult a Memorandum Which She had Previously Made.* One of the People's rebuttal witnesses, S, testified (on July 9, 1959) that she attended the party on the night of May 17, 1958, and did not recall seeing a $50 bill passed around, but that her memory of the events of that date was "somewhat hazy." The prosecuting attorney produced an account of the events of May 17 which S had written at the request of a policewoman on April 8, 1959. He asked, "Do you think that document would refresh your recollection. . . ?" S replied, "Yes, I think so." The prosecuting attorney then showed the statement to defense counsel and after an unreported colloquy with the trial judge out of the hearing of the jury the following occurred:

The trial judge asked, "Was the matter more clear in your mind than it is now?" S answered, "Well, I think it was, but —everything is so mixed up now. . . . I am trying to think of things that I might have forgot that I didn't remember before and everything's really getting mixed up."

Over defense objection the trial judge permitted S to look at the statement. The prosecuting attorney then asked, "Does that indicate that . . . when you did make or write that statement that you had no recollection of seeing any $50 bill in the evening [of May 17]?" S answered, "Yes, I don't remember seeing it."

Defendant urges that the requirements of section 2047 of the Code of Civil Procedure as to refreshing recollection were not met. That section provides in material part that "A witness is allowed to refresh his memory respecting a fact, by anything written by himself, . . . when the fact was fresh in his memory, and he knew that the same was correctly stated in the writing. . . ."

From the witness' testimony, after she examined the document, that "Yes, I don't remember," it appears that the writing did not contain a record which could refresh her recollection as to the fact of the occurrence or nonoccurrence of the incident of the $50 bill, but merely confirmed the witness' lack of memory of the matter. The People do not suggest any proper application of a doctrine of refreshing "past forgetfulness," and since the witness testified that she was not present at the piano bar throughout the events of the evening it does not appear that the document could properly be used to show that her lack of recollection when she testified was not feigned or the result of admitted confusion, but

rather that at an earlier time when she was calmer and her memory was somewhat better such memory did not include an incident so striking that, had it in fact occurred, she would probably have remembered and been able to describe it. (*Cf. People* v. *Hardenbrook* (1957), 48 Cal.2d 345, 351 [1] [309 P.2d 424]; *People* v. *Slobodion* (1948), 31 Cal.2d 555, 559-560 [3] [191 P.2d 1]; *Judd* v. *Letts* (1910), 158 Cal. 359, 366 [111 P. 12, 41 L.R.A. N.S. 156].)

Because of the prejudicially erroneous combination of developments as to the nonproduction of W as a witness, the judgment and order appealed from are reversed.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.