[Civ. No. 24729. Third Dist. Apr. 2, 1986.]

JOHN C. PAN, Plaintiff and Appellant, v.
STATE PERSONNEL BOARD, Defendant and Respondent;
DEPARTMENT OF CORRECTIONS,
Real Party in Interest and Respondent.

354

COUNSEL

Loren E. McMaster for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Charles C. Kobayashi, Linda A. Cabatic and Susan P. Underwood, Deputy Attorneys General, for Defendant and Respondent and for Real Party in Interest and Respondent.

OPINION

**SPARKS, J.**—Plaintiff, Dr. John C. Pan, was a physician and surgeon employed by the California Department of Corrections at the Correctional Training Facility, Soledad. The department dismissed him from his position

effective December 9, 1983. He appealed to the California State Personnel Board. After a hearing an administrative law judge prepared a proposed decision upholding plaintiff's dismissal and the board adopted the proposed decision as its decision in the matter. Plaintiff petitioned the Superior Court of Sacramento County for a writ of administrative mandate. The court denied the petition and entered judgment against plaintiff. On appeal it is contended: (1) the findings of the board are not supported by substantial evidence; (2) plaintiff's dismissal was improperly motivated and no cause for dismissal was established; (3) any negligence committed was the fault of the institution and its chief medical officer; (4) evidence was improperly excluded by the administrative law judge; and (5) the penalty of dismissal was excessive. We shall affirm.

## FACTS

This proceeding arose out of a single incident which occurred on February 12, 1983. The board found that both before and after the incident plaintiff was considered a good employee and that he performed his duties without any complaints from his superiors. On the date in question plaintiff was the facility medical officer of the day (MOD). This required him to be available for telephone consultation with medical technical assistants (MTAs) during nonoffice hours in the event of a situation beyond the competence of an MTA. Plaintiff was available at his home 24 miles from the Soledad facility.

On the evening of February 12, MTA Diaz was informed that 55- or 56-year-old inmate Benjamin F. was ill. Diaz reviewed the inmate's history and discovered that he had suffered a myocardial infarction (heart attack) in 1979, and had heart bypass surgery in 1980. Diaz visited the inmate and learned that he had taken five nitroglycerin tablets over a three-hour period but was still suffering radiating pain in his left arm and felt as though someone were sitting on his chest. Diaz had the inmate transferred to the infirmary.

At the infirmary the inmate came under the care of MTA Reach. Reach arranged for a telephonic EKG which is a procedure where the patient is placed on a monitor which transmits an EKG reading to a facility in Los Angeles. The interpreted results are then reported to Soledad by telephone. In this case the results were: "Rate 76, severe acute interior and anterior lateral MI, which appears to be a few hours old. Serial tracings are suggested." Reach took the inmate to the office and called plaintiff, as the MOD. He explained that the inmate was complaining of a heart attack, and that he reported that it felt like someone was sitting on his chest and he had pain radiating down his left arm. Reach also read the results of the EKG to

plaintiff. Plaintiff told him to give the inmate nitroglycerin for pain, to start an IV (intravenous solution), and to put him upstairs.

Reach and MTA Montgomery took the inmate to an emergency room table and started an IV. The IV ran for six to eight minutes and then the vein collapsed. They started an IV on the other arm and the same thing happened. MTA Laughton came in and began to assist in an effort to find a site for an IV. As they were doing this the inmate raised up and grabbed himself, turned cyanotic, and fell back. The MTAs began to perform CPR (cardiopulmonary rescuscitation) in an unsuccessful effort to revive the inmate. An ambulance was called to take the inmate to Natividad Hospital. Plaintiff was also called and he reported to the prison infirmary. The inmate was pronounced dead at the hospital.

Dr. Philip Hicks was the Soledad chief medical officer at the time in question. He offered the opinion that when a physician is informed that an inmate has a pain in his arm and tightness in his chest, and is read the results of the EKG which were reported for this inmate, then he should immediately tell the MTA to call an ambulance to take the inmate to an emergency medical facility. If he was not familiar with the patient's history of heart trouble then he should make inquiry. Hicks believed it would be negligent to simply direct that the inmate be given nitroglycerin and have an IV started.

Plaintiff testified that when he was first notified of the situation he was informed that the patient was suffering from chest pain and had been given nitroglycerin. His vital signs were stable. He was aware of the patient's prior history of heart problems, but not in full detail. The results of the EKG were given to him, but he was told that the myocardial infarction was "recent." He claimed this would mean it was two weeks, two months, or two years before. An infarction only hours past would be "acute." He was told that the inmate's pain had been alleviated, and so he told Reach to put him in the infirmary for observation, start an IV, and to give him nitroglycerin for pain as needed. He advised that he should be called upon any further development.

The board found that upon being given the information which plaintiff received on the night in question he should either have responded to the facility to view the patient himself or directed that he be transported to a hospital. Instead, he adopted the unsatisfactory and neglectful course of having the patient admitted to the infirmary with skimpy instructions for the MTAs. He placed the patient's life in peril and encumbered the MTAs with a seriously ill patient and no assistance in a facility with little equipment available to handle the emergency which occurred. This error was of a

serious nature and supported the Department of Corrections' decision to terminate plaintiff's employment.

DISCUSSION

I

 Plaintiff contends that the evidence does not support the board's finding that approximately 30 minutes passed between Reach's first telephone call and the inmate's fatal attack. The board found that the first call from Reach occurred at approximately 9:25 p.m., and that the attack occurred at approximately 9:55 p.m. Plaintiff points out that he testified the time between the call from Reach and the call from MTA Vargas after the attack was 10 minutes. He also points out that MTA Montgomery estimated the time between the first call and the attack to be seven to nine minutes. Finally, he notes MTA Laughton estimated he attempted to assist Reach in starting an IV for about five minutes, until 10 p.m., when the attack occurred.

 Where a decision of the State Personnel Board is reviewed on petition for writ of administrative mandate this court and the trial court apply the same standard of review: the substantial evidence rule. (*Warren* v. *State Personnel Bd.* (1979) 94 Cal.App.3d 95, 105 [156 Cal.Rptr. 351]; *Ng* v. *State Personnel Bd.* (1977) 68 Cal.App.3d 600, 604 [137 Cal.Rptr. 387].) Pursuant to that rule the factual determinations of the board must be upheld if they are supported by substantial evidence and all reasonable and legitimate inferences must be drawn in support of those findings. (*Warren* v. *State Personnel Bd.*, *supra.*) Upon viewing the record in such a light we find sufficient evidence to support the board's findings.

Reach testified that he called plaintiff at approximately 9:25 p.m. After he finished the telephone call he took the patient to an emergency room table where he prepared and inserted an IV. The initial IV worked for six to eight minutes and then the vein collapsed. Reach prepared and inserted an IV in the patient's other arm with the same result. At that time Laughton arrived and assisted Reach in attempting to start an IV. According to Laughton about five more minutes elapsed before the attack. This evidence is entirely consistent with Reach's estimate that 30 minutes elapsed between the telephone call and the attack. The activities of moving the patient to an emergency room table, preparation and insertion of two IVs which each lasted six to eight minutes before failing, and about five more minutes in attempting to start a third IV, would reasonably consume the time period of 30 minutes. The recollections of plaintiff and Montgomery that the elapsed time was only about 10 minutes created a conflict in the evidence, but it

cannot be said that no reasonable finder of fact could find that 30 minutes elapsed between the first call and the attack. Accordingly the finding of the board must be upheld.

In any event, the trial court correctly realized that the time period which elapsed between the call and the attack is not material. The department did not contend that plaintiff's actions or inaction caused the death of the patient. Plaintiff lived 24 miles from the prison and thus even if he had left for the facility immediately upon receiving Reach's call it was unlikely that he could have arrived before the fatal attack. Moreover, had he immediately directed that the patient be hospitalized it did not appear that could have been accomplished before the attack. Finally, there was no evidence presented to suggest that the patient's death could have been prevented if plaintiff had been in attendance or if he had been in a hospital. The basis for plaintiff's dismissal was not the result of his negligent behavior, but the fact of it. As the trial court noted, if there was a basis for taking punitive action against plaintiff, it was complete when he hung up the telephone. The board's written decision clearly shows that the discipline was imposed for plaintiff's failure to attend to his patient in an efficient and competent manner and not for the death of the patient. Accordingly, even if the time period between the call and the attack was actually shorter than that found by the board, it did not make any difference and was not prejudicial to plaintiff.

## II

Plaintiff contends that his discharge was improperly motivated and that no cause for discipline was established. He asserts that after the initial decision was made to fire him the department continued to insist on termination even though the premise for termination was shown to be false. He notes that Dr. Hicks prepared a report recommending adverse action in which he erroneously stated that Reach's initial call to plaintiff occurred between 8:40 and 9 p.m., while the fatal attack occurred at 9:55 p.m. When the Superintendent of Soledad sent a preliminary notice of adverse action several months later, the notice indicated that a time period of 45 to 55 minutes elapsed between the call and the attack. In the department's notice of adverse action the reference to elapsed time was deleted and the notice simply provided that: "You should either have seen the patient in person or transferred him to an acute care hospital immediately." Plaintiff contends that by this time "the die had been cast" and the dismissal would have been pursued regardless of the faulty premise on which it was based.

Plaintiff also contends that in preparing his recommendation Hicks relied upon a document shown to be false and contrived. The document is a report prepared for the signature of MTA Reach, but signed for Reach by Senior

MTA Montgomery. Reach testified that he would have written the statement differently and did not write it. Montgomery testified that he did not prepare it, and that he signed it for Reach as senior MTA, which he does frequently. Plaintiff contends that the inference which must be drawn is that Hicks prepared the report in order to support his decision to fire plaintiff for unknown and uncharged reasons.

Plaintiff's contention is specious. It was not clear who dictated the report which was signed by Montgomery for Reach. However, it does not follow that Hicks dictated the report in order to create a basis for firing plaintiff due to some unknown reason. Such a claim is wholly speculative and unsupported by anything in the record. Plaintiff's claim that the report was prepared to show a lengthy time period between the initial call and the fatal attack, in order to support an inference that the death was attributable to him, is rebutted by the document itself. The document does not purport to specify the time of the initial call or the period which elapsed between the call and the attack. Moreover, nothing in the document differs in a material way from the evidence presented at the hearing before the board.

Plaintiff's contention that the department kept changing the basis for his dismissal is also erroneous. Dr. Hicks had no authority to terminate plaintiff. He simply prepared a report recommending that the Soledad superintendent take adverse action. He did not claim that the inmate's death was attributable to plaintiff, nor did he indicate that the time between the call and the attack was a material factor in his recommendation. Instead, he said: "Dr. Pan used very poor judgment in his handling of the case, specifically by not immediately sending the patient by ambulance to Natividad Medical Center at the time he was first called." In the preliminary notice of adverse action the superintendent did not attribute the death to plaintiff. He wrote: "Given the patient's past medical history, you used very poor judgment in the handling of the case." In considering the superintendent's recommendation the department's chief of medical services offered the opinion that plaintiff's failure to go to the hospital to assess the patient in person or to transfer him to an acute care facility immediately constituted a gross neglect of duty, and the adverse action was taken on that basis and not on the basis the patient's death was attributable to plaintiff. ■ The purpose of the preremoval procedural protections accorded plaintiff is to minimize the risk of error in the initial removal decision. (*Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 215 [124 Cal.Rptr. 14, 539 P.2d 774].) ■ However, nothing precludes a governmental employer from imposing discipline on a valid basis simply because some immaterial fact is shown to be erroneous.

### III

■ Plaintiff contends the incident was the fault of the prison and the system of delivery of medical services rather than his own. He complains of the absence of any written standard operating procedure to guide medical decisions, and asserts that telephonic diagnosis and treatment is inherently inadequate. We reject this as an excuse for plaintiff's conduct. The practice of medicine has been described as "art and science." (Bus. & Prof. Code, § 2033.) ■ A physician must exercise that degree of care, skill, knowledge and competence ordinarily possessed by fellow practitioners under similar circumstances. (*Estate of Beach* (1975) 15 Cal.3d 623, 635 [125 Cal.Rptr. 570, 542 P.2d 994]; see also 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 514, p. 2778.) This includes the duty to use reasonable care and diligence in safeguarding a patient committed to his charge. (*Thomas* v. *Seaside Memorial Hospital* (1947) 80 Cal.App.2d 841, 847 [183 P.2d 288].) He must promptly employ such agencies as may reasonably appear necessary for the patient's comfort and safety. (*Valentin* v. *La Societe Francaise* (1946) 76 Cal.App.2d 1, 5 [172 P.2d 359].) ■ A physician may be found negligent in failing to respond to a patient's complaints or in failing to give adequate directions to medical care providers under his supervision. (*Lewis* v. *Johnson* (1939) 12 Cal.2d 558, 560 [86 P.2d 99]; *Dickow* v. *Cookinham* (1954) 123 Cal.App.2d 81, 85 [266 P.2d 63, 40 A.L.R.2d 1066].) ■ The very purpose of plaintiff's employment was to exercise care and skill in the treatment of patients and not to merely comply with any standard operating procedures. As the medical officer of the day plaintiff was required to be "on call" to respond to medical emergencies and to advise medical technicians of the proper course of action. In the face of an apparent heart attack plaintiff neither responded to the hospital to personally provide care, nor directed the patient be taken to an acute care facility to receive needed care. This had the effect of leaving the patient in a facility unequiped to care for him and unattended by a physician. The board was warranted in concluding this constituted a neglect of duty. (Compare *Fein* v. *Permanente Medical Group* (1985) 38 Cal.3d 137, 144-145 [211 Cal.Rptr. 368, 695 P.2d 665].)

### IV

■ Plaintiff contends that the matter must be remanded to the board for reconsideration of evidence that was wrongfully excluded by the administrative law judge. After Dr. Hicks had testified and the department had rested its case plaintiff called MTA Jolliff to testify. He was asked whether he had any experience with Dr. Hicks on a complaint for discipline against an MTA. Upon objection plaintiff made an offer of proof that Jolliff would testify that on a prior disciplinary matter against an MTA he had investi-

gated and determined there was no basis for the action. He confronted Dr. Hicks with the matter and Hicks admitted the matter was "bogus" and was not a proper charge, but he allowed the matter to proceed. The objection was sustained.

The administrative law judge was clearly correct in excluding the evidence. First, whatever Hicks did in a prior unrelated action against a different person had nothing to do with plaintiff. The evidence was purely collateral to the issues at plaintiff's hearing and it was within the administrative law judge's discretion to exclude it. (*People* v. *Lavergne* (1971) 4 Cal.3d 735, 741 [94 Cal.Rptr. 405, 484 P.2d 77]; *People* v. *Golden* (1961) 55 Cal.2d 358, 368 [11 Cal.Rptr. 80, 359 P.2d 448].) Second, the evidence was an attempt to impeach Hicks' character and the rule is settled that, except for prior felony convictions, specific instances of conduct are not admissible to attack or support the credibility of a witness. (Evid. Code, § 787.) Finally, it is a general rule that impeachment of a witness with proof of a prior statement should not be permitted unless the witness was asked to explain the statement while testifying or has not been excused from giving further testimony in the matter. (Evid. Code, § 770.) Hicks was not asked concerning the alleged statement when he testified and he had been excused and the department had rested. It would be inherently unfair to allow plaintiff to use Jolliff's testimony under such circumstances.

## V

We come now to plaintiff's final, and most arguable, issue. He contends that the penalty of dismissal is excessive. The board found that plaintiff should have either gone to the prison to view the patient personally or had him transported to the hospital. He did neither and instead left the patient in the prison infirmary with skimpy verbal instructions to the MTAs and where there was no equipment available to handle the subsequent heart attack. This was neglect of duty of a serious nature which left the inmates, staff and institution at risk. The board held: "Appellant is a professional employee engaged in a delicate task. The trust placed in him by his staff of MTAs (and their respect) as well as his duty to the patient were very clear on that night. He did not fulfill the trust of staff or the duty to his patient. The termination is sustained." In its written ruling the trial court recognized that this is a close and difficult question. The court stated that "at first blush" the penalty of dismissal might seem excessive. Nevertheless, when viewed in light of the fact that plaintiff's job required him to make life and death decisions, the trial court concluded that dismissal was not an abuse of discretion. The court said: "The exposure of risk to the particular service, to the inmates, and to the staff is immense. (Whether the same mistake is likely to be repeated is unlikely.) However, the Department of Correc-

tions should not be compelled to risk other negligent life-threatening judgment."

An administrative agency has broad, but not unlimited, discretion in the imposition of penalty or discipline. (*Warren* v. *State Personnel Bd.*, *supra,* 94 Cal.App.3d at p. 107.) In determining whether the agency has abused its discretion in the imposition of discipline the overriding consideration is the extent to which the employee's conduct resulted in, or if repeated, is likely to result in, harm to the public service. (*Id.,* at pp. 107-108.) Other factors include the circumstances surrounding the incident and the likelihood of its recurrence. (*Ibid.*) An agency's determination of penalty will be reversed only if it has abused its discretion. Such an abuse is only shown, if upon a consideration of the appropriate factors, it may be said that the decision is not one which could have been made by a reasonable person. (*Ibid.*; *Holt* v. *Department of Food & Agriculture* (1985) 171 Cal.App.3d 427, 437 [218 Cal.Rptr. 1].)

We agree with the trial court that under the circumstances dismissal cannot be considered an abuse of discretion. The very nature of plaintiff's job required him to make potential life and death decisions, particularly when he was acting as medical officer of the day. Neglect of duty necessarily had the potential for grave consequences to the inmates, staff and the institution. Neglect of duty must be considered in light of the potential consequences. This case is unlike the situation in *Skelly* v. *State Personnel Bd.*, *supra,* 15 Cal.3d at page 218, where the plaintiff's minor transgressions were not shown to have inconvenienced those with whom he worked or to have prevented him from effectively performing his duties. Here plaintiff's neglect of duty directly impinged upon the job he was hired to perform and had the potential for far more than mere inconvenience to inmates and staff. We cannot say that the decision to dismiss plaintiff constituted an abuse of discretion.

The judgment is affirmed.

Evans, Acting P. J., and Sims, J., concurred.